# FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL], | ) <br> ) <br> ) |
| Plaintiff-Relator, | ) <br> ) Case No. 3:10-CV-394 |
| v. | ) <br> ) JURY TRIAL DEMANDED |
| [UNDER SEAL], | ) <br> ) Varlan/Shirley |
| Defendant. | ) |

## COMPLAINT

## FILED IN CAMERA AND UNDER SEAL

**Pursuant to 31 U.S.C. § 3730(b)(2)**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

UNITED STATES OF AMERICA, *ex rel.* VICKY )
WHITE, )
                                )
      Plaintiff-Relator, )
                                )
      v. )    Case No. 3:10 CV-394
                                )    Varlan|Shirley
GENTIVA HEALTH SERVICES, INC. )    JURY TRIAL DEMANDED
                                )
      Defendant. )    **FILED IN CAMERA AND**
                                )    **UNDER SEAL**

## COMPLAINT

Plaintiff and Relator Vicky White, through her undersigned counsel, on behalf

of the United States of America, for her Complaint against Defendant Gentiva Health

Services, Inc., states as follows:

## I.    NATURE OF THE CASE

1.    This is an action brought by Vicky White ("White" or the "Relator")

under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended (the "False

Claims Act"), to recover damages and civil penalties from Defendant Gentiva Health

Services, Inc. ("Gentiva") on behalf of the United States of America (the "Government"), and

under the federal False Claims Act, 31 U.S.C. §§ 3730(h), the Tennessee Public Protection

Act, Tenn. Code. Ann. § 50-1-304, and Tennessee common law to recover damages from

Gentiva on her own behalf.

2.    Gentiva is one of the largest home health agencies in the country, with

revenues of $1.15 billion in 2009. Home health agencies, like Gentiva, provide home health

services to homebound patients. The Government, through Medicare, Medicaid and other

health insurance programs, reimburses home health agencies for providing home health services to qualified patients.

3. Gentiva has for years engaged in various fraudulent schemes designed to increase its profits at the expense of Gentiva's patients, employees, and, ultimately, Government payors. Through its various schemes, Gentiva seeks and receives reimbursement from the Government for providing home health services to patients that are not qualified to receive those services. Specifically:

A. Gentiva fraudulently seeks and receives reimbursement for providing home health services to psychiatric patients who are not eligible to receive those services.

Indeed, after White repeatedly reported to Gentiva management that most of psychiatric patients in one of Gentiva's offices were ineligible for home health services, Gentiva eventually performed an internal audit that revealed White was correct – approximately 50 of the 60 psychiatric patients being treated from that Gentiva office were not eligible for home health services.

Rather than immediately discharging these patients, and reporting to the Government that these patients were – and had long been – ineligible for home health services, Gentiva actively covered-up the audit results by instructing nurses to only gradually discharge the patients and, in some cases, to actually recertify the patient for additional home health services in order to avoid the type of mass discharge that would raise red flags and cause revenues to plummet. Gentiva never reported these improper certifications to the Government.

B. Gentiva fraudulently seeks and receives reimbursement for providing home health services to patients that are not homebound – a requirement for eligibility to receive home health services.

In some cases, Gentiva certifies that patients are homebound – and therefore eligible for home health services – even when those patients regularly drive themselves recreation centers.

C. Gentiva fraudulently seeks and receives reimbursement for skilled nursing services when Gentiva's own documentation indicates that

Gentiva's nurses provided no skilled service. To qualify as a "skilled" nursing service, the service must require the skills of a registered nurse to be safe and effective. Gentiva, however, seeks reimbursement for skilled nursing services even when Gentiva's own records fail to identify any that skilled service – *e.g.*, performed procedures, qualified observation and assessment, or patient teaching and training – was performed.

For instance, Gentiva seeks reimbursement for providing skilled nursing services even when Gentiva's documentation indicates only that the patient received a bath, or that that the patient was merely observed.

D.  Gentiva fraudulently provides unnecessary patient visits for the sole purpose of meeting certain reimbursement thresholds. For example, Gentiva management encourages its nurses and therapists to avoid visiting patients less than five times per treatment episode – without regard to patient need – because Gentiva receives a lower reimbursement amount from the Government for treatment episodes involving fewer than five visits.

E.  Gentiva fraudulently markets unnecessary home health services to the elderly. For instance, Gentiva nurses and sales staff "cold call" upon elderly patients in elderly housing facilities or their home and – without regard to patient need – asks whether the resident would like to have someone check in on them and visit from time to time. When the resident accepts the offer, Gentiva nurses and sales staff collect the resident's Medicare information, and contact the resident's physician seeking a referral for home health services.

4.  White is a registered nurse with over 30 years of experience in the healthcare industry. White worked for Gentiva as a Director of Clinical Operations and Services, and then as a Manager of Clinical Practice from January 2009 until May 2010.

5.  While she was employed at Gentiva, White witnessed each of the above-described fraudulent schemes, and experienced the culture at Gentiva that encourages the rampant fraud she witnessed. Gentiva's compensation structure provides bonuses and incentives to management employees that are based in part upon the patient census and revenues generated per patient. Gentiva management, in response, encourages nurses and

therapists to meet reimbursement thresholds without regard to patient need, and to not discharge patients "until they're dead."

6. Gentiva's internal audit program intentionally ignores the fraudulent certification and recertification of ineligible patients, empowering those perpetrating Gentiva's fraudulent schemes.

7. Gentiva employees with the courage and conviction to report instances of fraud, like White, are subjected to severe retaliation and, in White's case, the termination of employment.

8. Gentiva's schemes contribute significantly to the nation's soaring health care costs, and sacrifice the physical and mental well-being of its patients in order to enhance Gentiva's profits.

9. White brings this action under the False Claims Act to stop Gentiva's schemes, to recover, on behalf of the Government, damages and civil penalties from Gentiva, and to recover, on her own behalf, compensation for the retaliatory termination of her employment.

10. The False Claims Act prohibits knowingly presenting (or causing to be presented) to the Government a false or fraudulent claim for payment or approval. The False Claims Act also prohibits knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the Government. The False Claims Act also prohibits knowingly making or using a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

11.     Any person who violates the Federal False Claims Act is liable for civil penalties of up to $11,000 for each violation, plus three times the amount of the damages sustained by the Government.

12.     The False Claims Act allows any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery.

13.     All of the allegations in this Complaint are based on evidence obtained directly by White independently and through her own labor and efforts. The information and evidence that White has obtained or of which White has personal knowledge, and on which these allegations of False Claims Act violations are based, consist of her personal experiences while working for Gentiva, documents, computer data, and conversations with authorized agents and employees of Gentiva. White has provided that information to the Government in advance of filing this action and is, therefore, an original source of the information alleged herein.

14.     Pursuant to 31 U.S.C. § 3730(b)(2), White is providing the Government with a copy of the Complaint and a written disclosure of substantially all material evidence and material information in White's possession, along with a copy of the Complaint.

15.     In accordance with 31 U.S.C. § 3730(b)(2), the Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on Defendant until the Court so orders.

16.     The False Claims Act, 31 U.S.C. § 3730(h), also prohibits discrimination of any kind in the terms and conditions of employment because of lawful acts

done by an employee in furtherance of efforts to stop one or more violations of the False Claims Act.

17. Relief under 31 U.S.C. § 3730(h) includes reinstatement with the same seniority status that the employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

18. The Tennessee Public Protection Act, Tenn. Code. Ann. § 50-1-304, prohibits the termination of an employee for refusing to remain silent about illegal activities.

19. Tennessee common law prohibits the discharge or termination of an employee for any reason which violates a clear public policy.

## II. PARTIES

20. Plaintiff and Relator Vicky White resides in Morrison, Tennessee. White was employed by Gentiva from January 2009 until May 2010. White has direct and independent knowledge of the false claims alleged in this Complaint, and brings this action for violation of the False Claims Acts on behalf of herself and the Government.

21. Defendant Gentiva Health Services, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 3350 Riverwood Parkway, Suite 1400, Atlanta, Georgia 30339. Gentiva generates revenues by providing home health services to more than 350,000 patients from more than 350 community locations nationwide, including locations within this District and Division.

## III.   JURISDICTION AND VENUE

22.   This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, in particular, the False Claims Act. Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

23.   This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

24.   This Court has personal jurisdiction over Gentiva pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and Gentiva have sufficient minimum contacts with the United States of America.

25.   Venue is proper in this District and Division pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c) because Gentiva can be found in and transacts business in this District and Division.

26.   This action is not based upon a public disclosure. It is based on information that is within the direct and independent knowledge of White, who has voluntarily provided the information alleged herein to the Government prior to filing this action.

## IV.   BACKGROUND

### A.   Gentiva

27.   Gentiva is a publicly-traded (NASDAQ: GTIV) Delaware corporation with its principal place of business at 3350 Riverwood Parkway, Suite 1400, Atlanta, Georgia 30339.[1]  Gentiva is one of the largest home health agencies in the country with revenues of $1.15 billion in 2009.  Gentiva generates the overwhelming majority of its revenues by providing home health services to more than 350,000 patients from more than 350 community locations nationwide.

28.   As seen in the chart below, Gentiva receives approximately 70% of its home healthcare revenues from Medicare and 10% of its home healthcare revenues from Medicaid:

| Payor | 2009 | 2008 | 2007 |
|-------|------|------|------|
| Medicare | 73% | 68% | 66% |
| Medicaid | 8% | 13% | 16% |
| Other third insurers | 19% | 19% | 18% |

(10-K, p. 4).

29.   Gentiva is focused on growth; it increased its earnings per share in 2009 by 47%.  Because the prices it can charge for its home healthcare services are largely fixed by the Government, Gentiva's growth comes primarily from increasing the number of patients it serves, and increasing the services that it provides to each patient.

---

[1]   The information about Gentiva provided herein is based upon Relator's experience and Gentiva's United States Securities and Exchange Commission Form 10-K for the fiscal year ended January 3, 2010 ("10-K"), a copy of which is attached to the Appendix to Disclosure Statement ("Appendix") as Exhibit 1.

**B.**    **Gentiva's Interaction With Government Payors**

**1.**    **The Medicare Certification and Recertification Process**

30.    As a condition of participation in the Medicare and Medicaid programs, home health agencies ("HHA"), like Gentiva, must agree to comply with all federal, state and local laws and regulations.  On information and belief, Gentiva expressly agreed to comply with all federal state and local laws and regulations as a condition of participation in and payment from the Medicare and Medicaid programs.

31.    Patients are referred to HHA's for home health services ("HHS") by physicians who must certify that the patient is under the physician's care, that the physician has established and will periodically review a 60-day Plan of Care ("POC") for the patient's HHS, that the patient is homebound, and that the patient requires one of the types of HHS that qualifies him or her for Medicare; specifically, intermittent skilled nursing, physical therapy, speech-language pathology, or occupational therapy.

32.    Upon referral of the patient, the physician provides the HHA with a POC outlining the type of services to be provided to the patient as well as the frequency of the services.  The POC must also include instructions for timely discharge.

33.    Once an HHA receives a referral for a patient, it must conduct an initial assessment of its own to determine the patient's medical needs and eligibility for HHS.  To certify that a patient is eligible for HHS, the HHA must determine, *inter alia*, that the patient is homebound and that the patient requires one of the qualifying services listed above.  The HHA must also determine that the services being provided are "medically reasonable and necessary," that the care is meant to treat the patient's injury or illness and that the goals of

the treatment are aimed at helping the patient regain his or her independence, and become as self-sufficient as possible.

34.     The initial assessment is documented in an Outcome and Assessment Information Set ("OASIS") form (Form 485), and submitted to the Government, through a Medicare administrative contractor ("MAC") or fiscal intermediary ("FI"), for payment. The accurate transmission of OASIS data is a condition of participation in the Medicare and Medicaid programs.

35.     A patient's POC lasts for no more than 60 days. That 60-day period is called an episode. Upon completion of an episode, a patient must be recertified to receive HHS funded by Medicare. To be recertified, the patient's physician must review and sign the patient's POC, making any changes necessary, and the HHA must complete a new assessment ensuring that the patient is still eligible to receive Medicare-funded HHS.

### 2.     The Prospective Payment System

36.     The Prospective Payment System ("PPS") is a Medicare reimbursement method that provides payment to HHAs for the home health care that they provide. Payments are made for the 60-day episodes, and are based on the national episode rate. When an HHA sends the OASIS information it has gathered from a patient's initial assessment, as discussed above in the Certification section, an adjustment is made to the standard national episode rate to account for the amount and type of care that the patient requires. The amount of payment for that patient's episode is then determined.

37.     The HHA's reimbursement for HHS is typically given in two separate payments. After performing its initial assessment, sending in the OASIS information from that assessment, sending a finalized POC to the physician to be signed, and performing at least one

visit to the patient, an HHA will submit a request for anticipated payment ("RAP") to Medicare, and will collect a percentage of that particular patient's episode rate. At the end of each episode, after all physician orders have been signed, the HHA will submit a final episode claim requesting the remaining percentage of that patient's episode rate.

### 3.    Adjustments to Reimbursement

38.    There are several ways through which an HHA can receive more or less than the reimbursement rate determined from the original POC and OASIS information, including a Low Utilization Payment Adjustment ("LUPA"), and a Therapy Threshold ("TT").

39.    A LUPA is made when the HHA provides four or fewer visits in a given episode, in which case the HHA's payment will decrease to a per visit amount based on, *inter alia*, how many visits occurred and the type of visits that occurred.

40.    A TT can also change the amount of reimbursement an HHA receives for services it renders. Since 2008, there have been three primary visit thresholds – six visits, 14 visits, and 20 visits – that, if reached, increase the reimbursement to the HHA providing the services.

### 4.    Eligibility Requirements

41.    As set forth above, to qualify for Medicare-funded HHS, a patient must, among other things, be homebound and need one or more of the following HHS: intermittent skilled nursing, physical therapy, speech-language pathology, or occupational therapy.

42.    A patient is homebound if the patient's condition prevents the patient from leaving the home, or if leaving the home requires a considerable and taxing effort. A

patient may be considered homebound even if the patient leaves the home for infrequent or short periods, such as to attend a religious ceremony or for required health care treatment. A patient would not be considered homebound, however, if that patient does not leave his or her house simply because of feebleness and insecurity brought on by advanced age.

43.    A patient needs intermittent skilled nursing care if the service to be provided to the patient must be provided by a registered nurse or a licensed practical (vocational) nurse under the supervision of a registered nurse to be safe and effective. A service is not considered a skilled nursing service if it can be safely and effectively performed (or self-administered) by a nonmedical person, even if a competent person to provide that non-skilled service is not available.

44.    Giving a bath, for example, would generally not be considered a skilled nursing service, unless something about the condition of the patient requires that the bath be given by a registered nurse.

45.    Services provided by a psychiatrically trained nurse may be covered by Medicare as a skilled nursing service, if the treatment is reasonable and necessary. Services of a psychiatric nurse would not be considered reasonable and necessary to monitor the condition of a patient with a known psychiatric illness who is on treatment but is considered stable. A patient is considered stable if their symptoms are absent or minimal or if symptoms were present but were relatively stable and did not create a significant disruption in the patient's normal living situation.

**C.    The Relator, Vicky White**

46.    Vicky White, now 55 years old, is a registered nurse who has been working in the healthcare industry for her entire professional career. White began her

nursing career at Warren County General Hospital where she worked as a registered nurse from 1976 until 1992. White then started working in the home healthcare industry at a company that, after several ownership changes, eventually came to be known as Intrepid. While at Intrepid, White held a variety of management positions supervising nursing professionals. Seeking better benefits, White left Intrepid in 2008, and began working as registered nurse once again, this time at River Park Hospital in the ICU unit.

47.   In late-2008, Gentiva recruited White based upon her reputation in the nursing and home healthcare community and, after a brief interview process, offered White a job. White accepted Gentiva's employment offer and began working for Gentiva as the Director of Clinical Operations and Services ("DCOS") on January 30, 2009.

48.   As the DCOS, White reported to Brian Bacon, who headed up Gentiva's McMinnville and Tullahoma offices as a Branch Director. Bacon, in turn, reported to Deana Murphy, the Area Vice President. As the Area Vice President, Murphy was ultimately responsible for Gentiva's McMinnville and Tullahoma offices, as well as offices in Hopkinsville, Lebanon, Nashville, Smyrna, and West Nashville, Tennessee.

49.   White was hired to work from Gentiva's McMinnville, Tennessee office, and spent the majority of her time at Gentiva working from the McMinnville office. White, however, at Bacon's request, spent her first six weeks at Gentiva in its Tullahoma, Tennessee facility so she could receive training on Gentiva's software programs. White also returned to Tullahoma from time to time to help the Tullahoma office audit patient files by reviewing, among other things, OASIS documents and other documents created by nurses and therapists reflecting the condition of, and services received by patients. In late 2009, White took on additional responsibilities in the McMinnville office, including reviewing and

"locking" OASIS documents so that the Government could access those records in connection with the reimbursement process.

50.     After initially receiving extraordinary praise for her services, White suddenly began receiving a barrage of unwarranted criticism after she uncovered and internally reported to senior management the illegal practices disclosed herein. Gentiva ultimately terminated White's employment on May 19, 2010 based upon false and obviously manufactured allegations of poor performance that were mere pretext for Gentiva's retaliatory motives.

## V.     GENTIVA'S FRAUDULENT SCHEMES

51.     Gentiva fraudulently boosts its revenues from Government payors, as detailed below, by: (1) recertifying psychiatric patients who are stable and for whom HHS are neither reasonable nor necessary; (2) certifying and recertifying patients that are not homebound; (3) recertifying psychiatric, skilled nursing, and physical therapy patients that do not meet Medicare criteria for home health; (4) visiting patients for the purpose of meeting certain payment thresholds without regard to whether services are needed; and (5) marketing and providing unnecessary services to the elderly.

### A.     Gentiva Fraudulently Recertifies Psychiatric Patients

52.     When White started working in Gentiva's McMinnville office, one of her responsibilities as the DCOS was to review patient records to ensure that they were complete and that the patients qualified for home healthcare.

53.     White quickly noticed that many of the psychiatric patient charts seemed to indicate that the patient was stable – either because the patient was not experiencing symptoms or because any symptoms were minimal and not disrupting the

patient's life – and, therefore, not eligible for HHS. Nonetheless, Gentiva had recertified these patients time and again.

54. The psychiatric nurses who visit with patients and create these patient charts were required to share their reports with Bridget Freeze, the Manager of Clinical Practice ("MCP") in the McMinnville office, so that Freeze could review them to ensure, among other things, that the patient qualified for home healthcare, and then certify them. White noticed, however, that Freeze was certifying and/or recertifying the patients for home health services without even reviewing the psychiatric patients' charts.

55. White approached Freeze regarding her observations of the charts and asked Freeze why she was allowing recertification of these patients for home healthcare. Freeze explained that Jo Ellen Young, the unofficial "team leader" of the psychiatric nurses in the McMinnville office, along with Jimmie Webb, the quality assurance ("QA") nurse in the McMinnville office, had worked together to establish and grow the psychiatric patient program in the McMinnville office, and that she did not feel comfortable complaining to Webb about the psychiatric patient charts.

56. White took it upon herself to speak with Webb about the improper recertification of patients, explaining that many of the patients had been recertified six times or more despite the fact that their charts indicated that the patient was stable. Webb responded by telling White that Gentiva had, on several occasions, audited the psychiatric patient records and had not uncovered any issues. Webb said to White, "if it ain't broke, don't fix it," and instructed White to not raise the issue again. It was clear to White that Webb knew the recertifications were inappropriate.

Case 3:10-cv-00394-PLR-CCS   Document 1   Filed 09/08/10   Page 16 of 50   PageID #: 16

57. While White was in the DCOS position, she learned that Webb received bonuses from Gentiva that were based, at least in part, on the patient census at McMinnville.

58. Young was motivated to grow the psychiatric patient census because, like the other psychiatric nurses, she was compensated at a higher level for treating psychiatric patients than she would have been compensated for treating other patients. The other psychiatric nurses knew that if the psychiatric patient census declined, their jobs would be in jeopardy.

59. Over time, White learned that psychiatric nurses were not only seeking recertification of stable, and therefore ineligible, patients, but were actively falsifying patient charts in order to avoid the possibility of a physician recognizing, or an audit revealing, the fact that the patient was in stable condition and ineligible for home health services. The psychiatric nurses either added or exacerbated "facts" in the patient charts in order to suggest that the patients' condition had somehow changed or deteriorated so that they could recertify the patient.

60. For example, after White started working in the McMinnville office, Gentiva hired another psychiatric nurse named Leslie Myers to help keep up with the growing psychiatric patient census. White knew Myers from her prior work experience and supported her hire because White knew that Myers was honest and had a great deal of prior experience with psychiatric patients. In fact, Myers actually taught psychiatric nursing in the LPN program for five years before Gentiva hired her.

61. In September 2009, Myers told Young that she planned to discharge one of the psychiatric patients because the patient was stable and not having any delusions or hallucinations. Young instructed Myers not to discharge the patient and explained Gentiva's

practice of keeping psychiatric patients recertified as long as possible. When Myers explained that the patient simply did not qualify for recertification, Young told Myers roughly the following: "This is the way we do it – we pull out a delusion or hallucination at the end of the cert, then exacerbate the schizophrenia, then recert."

62.     Myers was extremely upset that Young had asked her to falsify a patient chart, and told White about her conversation with Young. Almost immediately thereafter, Young approached White and said that the psychiatric nurses had "taken a vote" and decided that they did not want Myers to work as a psychiatric nurse anymore. White refused to pull Myers from the psychiatric nursing group.

63.     The psychiatric nurses' practice of falsely recertifying patients for home healthcare was not motivated solely by their desire to increase their job security. Bacon, who as a Branch Director also received bonuses from Gentiva that were based, at least in part, on the patient census at McMinnville, knew about and encouraged the psychiatric nurses to do whatever it took to keep patients recertified. Indeed, on two or three different occasions, Bacon laughingly said in front of White and other McMinnville staff member that "McMinnville doesn't discharge [patients] until they're dead."

64.     As a result of this culture, Gentiva recertified patients between 50% and 70% percent of the time. Weekly Census Reports reflecting these percentages are attached hereto as Exhibit 1.

65.     Gentiva frequently recertified the same patient over and over again, often keeping psychiatric patients in its care for years. For example:

- Patient A had a principal diagnosis of anxiety, and began receiving treatment from Gentiva on April 16, 2007. Patient A repeatedly was recertified by

Gentiva, continuing to receive care, paid for by Medicare, until November 25, 2009 – *over two and one-half years*. Patient A's Intake Report is attached hereto as Exhibit 2.

- Patient B had a principal diagnosis of depression, and received home healthcare from Gentiva, paid for by Medicare, for *over two years*. Gentiva recertified Patient B *twelve times*. Patient B's Intake Report is attached hereto as Exhibit 3.

- Patient C had a principal diagnosis of depression. Gentiva recertified Patient C for home healthcare, again paid for by Medicare, *23 times, covering almost four years*. Patient C's Intake Report is attached hereto as Exhibit 4.

- Patient D received "psychotherapy services" provided by Ruth Hobbs, a Gentiva psychiatric nurse, on a weekly basis for years. Patient D, however, had been nonverbal and nonresponsive – virtually comatose – during that entire time.

- Attached hereto as Exhibit 5 are additional Patient Intake Reports revealing that Patients A, B and C were not outliers at Gentiva office, but rather were the norm.

66.     Gentiva submitted claims for payment to the Government for providing HHS to psychiatric patients who recertified for Medicare-paid HHS despite the fact that those patients were stable or not experiencing any symptoms.

67.     Gentiva's emphasis on recertifying psychiatric patients resulted in the Gentiva McMinnville office (located in a town with a population of approximately 13,000)

having a grossly disproportionate number of psychiatric patients in its census: of Gentiva's approximately 125 total patients, over 60 were psychiatric patients in 2009.

68.     Gentiva's practice of fraudulently recertifying psychiatric patients was not limited to the McMinnville office.  For example, Larry Moore, a psychiatric nurse in Gentiva's Tullahoma office told White that the Tullahoma office engaged in the same practices with psychiatric patients as the McMinnville office did.

### B.     Gentiva Fraudulently Certifies and Recertifies Patients that are Not Homebound

69.     White's review of patient charts, and her conversations with other Gentiva employees, revealed to White that Gentiva routinely certifies and recertifies patients that are not homebound – and, therefore, not eligible for home healthcare – in order to keep revenue and patient census up.

70.     For example, Jamie Word, the Physical Therapy Director for both McMinnville and Tullahoma, told White that in mid-June 2010, the McMinnville office received a referral for physical therapy.  Kay Myers, a Physical Therapist, evaluated the patient and determined that the patient did not qualify for HHS because the patient was not homebound.  In fact, Word reported to White that this particular patient was driving her car every day for reasons unrelated to her medical treatment and, therefore, was not homebound.  When Monica Deaton, a Gentiva Sales Representative, learned that Myers did not admit the patient, Deaton complained to Bacon.  Bacon, in turn, sent a different clinician from the Tullahoma office out to visit the patient, and the patient was admitted for Tullahoma.

71.     Similarly, Moore told White about a patient he treated in Tullahoma who drove her car to a recreation center every day.  Despite the fact that this patient plainly was not

homebound, Moore was instructed to continue treating and recertifying the patient. Moore told White that there were many similar examples at the Tullahoma office because "they tell us not to discharge patients that are not homebound." Word echoed Moore's statements about the direction from management in the Tullahoma office to not discharge patients even if they are not homebound. Murphy pressured all of the Directors in her region to keep the patient census up in order to increase revenue.

72.     Gentiva submitted claims for payment to the Government for providing HHS to patients that were not homebound.

### C.     Gentiva Fraudulently Recertifies Patients that Do Not Receive Skilled Nursing Services

73.     During White's initial training period at Gentiva, she was stationed in the Tullahoma office for approximately six weeks learning how to use Gentiva's software program by entering patient recertification information. White was shocked by the documentation she reviewed. Gentiva routinely recertified patients that had not needed, or received, any skilled service during the preceding treatment episode.

74.     In June 2009, while White was working from the McMinnville office, White again audited patient charts from the Tullahoma office. White audited five charts and discovered that none of the five patients were eligible for HHS. These charts revealed no identifiable skilled service being provided to these patients – no teaching to patient or caregiver, performed procedure, or Observation and Assessment.

75.     When White told Bacon about this problem, Bacon blamed the problem on one particular nurse in Tullahoma. White pointed out that the five charts she reviewed were

prepared by five different nurses and therapists in Tullahoma. Bacon essentially brushed off White, suggesting that he would look into the matter.

76. Gentiva submitted claims for payment to the Government for providing unnecessary HHS to each of these patients.

77. White also spoke with Word about Tullahoma's charts. Word agreed with White's assessment, telling White that Tullahoma's charts were "not billable" on several occasions. Word frequently audited charts in Tullahoma and told Bacon and Lovvorn that the charts were not billable. She asked Bacon if she should hold releasing claims to Medicare and he told her "no." Lovvorn, Gentiva's "Education Specialist" received a copy of all charts audited by Word.

78. In September 2009, White accompanied Betty Ann Mayson, the Regional Director of Regulatory Compliance, on a home visit during the annual internal audit. They observed Ruth Hobbs, a registered psychiatric nurse in the McMinnville office, "treat" a psychiatric patient. The "skill" Hobbs' allegedly provided to the patient, according to the notes on the patients' chart, was an instruction to "look at picture on the wall and think happy thoughts." Mayson reported that the home visit went well. White was shocked that Mayson purported to believe that the visit was appropriate and billable to Medicare.

79. Gentiva's Nashville office also has significant documentation defects that are known to Gentiva as a result of internal audits. The Nashville office also fails to provide the appropriate level of care to those patients that are legitimately recertified. Indeed, the Nashville office, with an approximate census of 125 patients, does not have a single full-time registered nurse.

**D.**   **Gentiva Fraudulently Provides Patient Visits For The Sole Purpose of Meeting Reimbursement Thresholds**

80.   In addition to certifying and recertifying ineligible patients for home healthcare, Gentiva also fraudulently boosts its revenue stream by directing its nurses to visit patients with the frequency that maximizes revenue, without regard to the medical necessity of such visits.

81.   For example, Bacon repeatedly told the McMinnville staff to avoid "LUPAs." As set forth above, LUPA is an acronym for Low Utilization Patient Adjustment, and under Medicare PPS, HHAs receive a reduced payment for any episode during which the patient receives four or fewer visits.

82.   Murphy and Bacon stressed to White that they should see patients no less than five times without regard to patient need. For example, Vickie Kell and Jennifer Fults, both registered nurses, were encouraged to make sure they made at least five visits per patient episode. White instructed Kell and Fults to do the fifth visit only if it was necessary and justifiable. Murphy, Bacon and Liz Lovvorn, Gentiva's Certified Education Specialist, monitored weekly "Projected vs. Actual" reports to identify patients who received less than five visits. Bacon questioned White about every LUPA, demanding that she explain to him why five visits were not done.

83.   Similarly, under Medicare PPS, HHAs receive increased reimbursement amounts for hitting certain patient visitation or therapy thresholds. White learned that Gentiva strongly encouraged its nurses and therapists to visit patients just enough times to hit the threshold that triggered the increased payment.

84.     For example, when a therapist recommended that a patient receive 19 visits in order to help the patient meet his or her goals, Gentiva's branch and therapy directors encouraged the therapist to change the recommendation to 20 visits without medical justification. The branch and therapy directors justify these revenue-based changes by asking, "if the patient needs 19 visits, then why not 20?"

85.     Shortly before White started at Gentiva, the therapy threshold was ten. At that time, Directors and therapists were instructed to encourage at least ten therapy visits per episode. Later, that therapy threshold decreased from ten to six. Then, Directors and therapists were instructed to encourage six to 25 therapy visits per episode.

86.     In May 2010, during a conference, Bacon said that the McMinnville office was not meeting the therapy thresholds and that there were too many cases of therapy patients not getting the projected visits done. Nora Henn, a Physical Therapy Assistant, informed Bacon that she did not make some visits either because the patient had a medical appointment or were not home. Bacon instructed Henn to make up any therapy visits that were missed. Henn got upset in front of the staff and told Bacon that his response made her want to look for another job.

87.     Gentiva put pressure on its therapists around the country to hit therapy thresholds.

88.     Derek Nordman, a Gentiva Regional Rehabilitation Director for the Mid Atlantic Region, sent an email to Paddy Cunningham, Gentiva's Assistant Vice President for Regulatory Affairs, inquiring about Gentiva's recent focus on documenting patient records and claims. Cunningham explained that Cahaba, a Medicare Administrative Contractor, had launched probes into Gentiva's activity in Quincy, Massachusetts and Austin, Texas related to

Gentiva's average number of visits per encounter. Cunningham also stressed to Nordman the high degree of risk to Gentiva associated with increased Government audits of Gentiva's activity, saying:

> I think if we look at the figures above for Quincy we can see that there is a huge risk. The objective of the 'digging into the charts' right now is to identify if the Quincy situation is specific to this office or if it is a more widespread problem within the company and to identify our deficits in relation to the risk areas of coverage eligibility, homebound, medical necessity, skill, etc. *What we are identifying is that it is a widespread problem and we do have some risk.* (emphasis added.)

89. On March 31, 2010, Nordman forwarded Cunningham's response to White and other managers in the Mid-Atlantic Region, confirming for White that Gentiva's schemes with respect to "coverage eligibility, homebound, medical necessity, skill, etc.," were widespread throughout Gentiva. A copy of this March 31, 2010 email from Nordman to Mid-Atlantic Region is attached to the Appendix as Exhibit 6.

90. Gentiva submitted claims for payment to the Government for providing unnecessary patient visits made for the sole purpose of meeting therapy thresholds.

### E. Gentiva Fraudulently Markets Unnecessary Services to the Elderly

91. Gentiva further attempts to boost its patient census by inappropriately marketing unnecessary services to the elderly.

92. For example, in order to boost the psychiatric patient census in McMinnville, Young solicited elderly men and women living in elderly housing facilities or their home by randomly knocking on residents' doors to ask whether they would be interested in having someone come visit them. If the resident – who typically lived alone – indicated that they would like a visit, Young would obtain their Medicare information and

their physician's name so she could call the physician and ask that the patient be referred to Gentiva.

93. Christy Buono, Gentiva's Area Director of Sales, not only knew about Young's solicitation practices, but actively participated in them, accompanying Young on some of her recruiting visits. Buono stated at a Budget meeting in September 2009 that she accompanied Young and Tammy Ports, a former Sales Representative, on a home visit to try to get a patient to agree to receive HHS.

94. Gentiva submitted claims for payment to the Government for HHS provided to patients obtained through these marketing techniques.

## VI. WHITE'S ATTEMPTS TO CURTAIL GENTIVA'S FRAUDULENT PSYCHIATRIC PATIENT RECERTIFICATION SCHEME

### A. White's Initial Reports

95. White was alarmed by the improper certifications and recertifications she observed during her first few months at Gentiva.

96. After White's above-described conversation with Webb about the improper psychiatric patient recertifications in the McMinnville office, White approached Bacon about the issue and suggested that Gentiva conduct an internal audit to determine whether the psychiatric patients qualified for home healthcare. White told Bacon that she believed Gentiva was engaged in fraud. Bacon largely ignored White's concerns, prompting White to approach Liz Lovvorn, Gentiva's Certified Education Specialist.

97. White told Lovvorn, at various times, about both the psychiatric patient recertification issues in the McMinnville office, and the inappropriate certification and recertification issues in the Tullahoma office. White told Lovvorn that she believed Gentiva

was engaged in fraud. Lovvorn told White that she would talk to Murphy about White's concerns.

98.     White's concerns were unaddressed for months.

**B.     The September Audit**

99.     In September 2009, Betty Ann Mayson, the Regional Director of Regulatory Compliance, conducted an internal annual field audit ("September Audit") of all of McMinnville's records.

100.     Mayson's audit was routine and was neither focused on the psychiatric patients, nor the result of White's repeated reports. White nonetheless hoped that Mayson would uncover the fact that the psychiatric patients were routinely inappropriately recertified.

101.     Mayson concluded, however, that nothing was wrong with McMinnville's records. A copy of Mayson's September 17, 2009 email regarding her Annual Field Audit is attached hereto as Exhibit 7. Indeed, Mayson praised the psychiatric charts she reviewed, stating that "the documentation was there." Kell was present when Mayson made this comment during the internal audit exit conference call of all managers in middle Tennessee.

**C.     The October Audit**

102.     During a budget meeting around the same time as the September audit, White told Murphy, Bacon and others about Young's instruction to Myers that she falsify a psychiatric patient's chart in order to support recertification. White told the group that "if Medicare came in here, they would shut our doors." Despite White's report, to the best of White's knowledge, no one at Gentiva ever disciplined – or even spoke to – Young about her actions.

103.     Dismayed by Gentiva's reaction to her report about Young, and disappointed that the September audit was entirely ineffective, White redoubled her efforts to have Gentiva conduct a formal audit of the psychiatric patient charts in McMinnville.

104.     As a result of White's persistence, in October 2009, Lovvorn and Georgia Thompson, an Area Clinical Specialist from the Regional Brentwood, Tennessee office, conducted a three-day audit of McMinnville's psychiatric patient records.

105.     Lovvorn and Thompson found that approximately 50 of the 60 psychiatric patients on McMinnville's census were not eligible for HHS and needed to be discharged.

106.     Lovvorn and Thompson told White that many of the patient records indicated that the patients were "stable," and/or not receiving any skilled nursing service.

107.     As a result of the audit, Thompson returned to the McMinnville office the next week to provide the psychiatric nurses with training on the certification and recertification process. A copy of the Performance Improvement Action Plan Psychiatric Nursing related to this training is attached hereto as Exhibit 8.

108.     Gentiva, however, did not report to the Government that it had wrongfully accepted reimbursement from the Government for certifying and recertifying these patients. Nor did it immediately discharge the 50 psychiatric patients that Lovvorn and Thompson found to be inappropriately recertified. Nor did it reimburse the Government for the wrongfully accepted reimbursements from the Government that it uncovered under the audit.

109.     To the contrary, Thompson told the psychiatric nurses that the patients would be gradually discharged over time, and instructed them to recertify patients that were near the end of their 60-day episode.

110. Thompson's instructions to knowingly create additional false certifications prevented McMinnville's census from experiencing an immediate decline of more than 40 percent and helped prevent the discovery of the improper recertifications.

111. Gentiva submitted claims for payment to the Government with respect to services provided to these patients that Gentiva knew were not eligible for reimbursement. White locked the OASIS documents for these patients, allowing the Government to access those records in connection with the reimbursement process.

112. Over the next few months, McMinnville's psychiatric patient census dwindled and by December 2010, McMinnville was treating only five or six psychiatric patients.

113. The drastic decrease in the psychiatric patient census led to a corresponding decrease in Medicare revenues for the McMinnville office. In July 2009, monthly revenues were $207,581. By December 2009, monthly revenues dropped to $127,764. The last of the unqualified psychiatric patients was discharged by the end of December 2009. By January 2010, Medicare revenue was $89,137. A copy of Weekly Census Reports reflecting these changes is attached hereto as Exhibit 1.

114. Despite the fact that White's actions ultimately led to a reduced patient census in the McMinnville office, many of the nurses were grateful for White's actions. For example, Kay Myers, a Physical Therapist in the McMinnville office, told White that she knew that many of the psychiatric patients were not qualified for HHS and she felt very uncomfortable providing physical therapy for those patients. Nora Henn, a Physical Therapy Assistant, and registered nurses Vickie Kell, Jennifer Fults, Sharon Cope, and Leslie Myers all expressed similar sentiments to White.

115.    White's supervisors, however, were not pleased with White.

## VII.   GENTIVA RETALIATES AGAINST WHITE FOR UNCOVERING AND REPORTING FRAUD

116.    Immediately after the October audit, White's treatment by Bacon and Murphy, and White's working relationship with each of them deteriorated dramatically.

117.    During the first nine months of her employment at Gentiva, White received regular praise from Murphy and Bacon for her fine work.  For example:

- In May 2009, Murphy wrote an email to the managers in her region congratulating White for her work: "Vicky White in McMinnville has done a great job since coming aboard!  They hold the title for best gross margin in April, coming in at an incredible 62%!  Direct cost per visit has dropped by $16 per visit since January in McMinnville!  They enjoy a positive variance of 21% on the net revenue line, and 49% on the EBITDA line year to date.  Their reimbursement per visit for non Medicare is a staggering $196 per visit!  Nicely done Vicky!"  A copy of Murphy's May 2009 email is attached hereto as Exhibit 9.

- On August 5, 2009, Bacon sent an email to Murphy summarizing his weekly report, stating:  "McMinnville ended the month beating Revenue and Qualified admits, with Revenue +15k and admits +5 with 34 of 29 budgeted."  In response, Murphy wrote:  "Congratulations to Vicky, Monica, and the whole team in McMinnville for a strong performance in July."  A copy of that August 5, 2009 email exchange between Murphy and Bacon is attached hereto as Exhibit 10.

Case 3:10-cv-00394-PLR-CCS   Document 1   Filed 09/08/10   Page 30 of 50   PageID #: 30

118.     White also received praise from patients.  Such praise was passed around to Murphy's team in an email from Dana Boliard, a Gentiva National Sales Call Center Specialist, in which she wrote:  "I just received a call on the 999-GENTIVA line with a compliment for Vicky White.  The patient, [redacted], stated that Vicky is 'great to speak with when you call in to the office and she is very sweet to speak with!'  Kudos to Vicky!!"  A copy of that email from Boliard is attached hereto as Exhibit 11.

119.     Additional examples of Murphy and Bacon praising White prior to October 2009 are attached hereto as Exhibit 12.

120.     The praise Murphy and Bacon heaped upon White was replaced, immediately after the October audit, with unwarranted criticism and outright abuse designed to harass White into resigning.

121.     In October 2009, Bacon terminated Freeze, the MCP in the McMinnville office.  Murphy and Bacon refused to fill that position, instead requiring White to do the work of two jobs:  a DCOS and an MCP.  To keep up with the requirements of those two positions White was forced to work nights and weekends, averaging approximately 60 hours per week.  When White asked Murphy or Bacon if they planned to fill the MCP position, they told White that McMinnville's reduced patient census – a result of the audit White requested – did not warrant additional office help.

122.     During a January 10, 2010 meeting, Murphy and Bacon told White that they were considering demoting White from the DCOS position to the MCP position.  White asked why they were considering this action, but they did not offer any specific reason; rather, they stated that she was not doing a good job in the DCOS position.  White asked for

specifics, but neither Bacon nor Murphy offered any valid support for the threatened demotion.

123. Thereafter, Bacon continued to criticize White without justification. For example, on February 5, 2010, Bacon wrote an email to White directing her to communicate with Kathy Fisher, Manager of Clinical Practice and Chief Nursing Officer, and staff members in other branch offices about coding and how to do Start of Care ("SOC") Case Conferences. Specifically, Bacon wrote: "Please also talk to Kathy about how you do the SOC Case Conferences. I saw you spending a great deal of time on them; in Tullahoma it only takes a few minutes. Your clinicians are only paid $5 for that time so it must be brief. . . . Your census of 50 does not currently justify additional help in the office." A copy of that February 5, 2010 email from Bacon to White is attached hereto as Exhibit 13.

124. White, of course, knew full-well how to do coding and SOC Case Conferences properly and how much time it takes. Bacon's email was a reflection of Gentiva's disregard for proper documentation – the type of documentation that reveals whether certifications are appropriate – and also reflective of Bacon's efforts to manufacture false performance issues and demean White, who had many years of experience coding and doing SOC Case Conferences.

125. Also on February 5, 2010, Murphy wrote an email to White, with a copy to Bacon, expressing concern about White's request that the MCP position be filled. Murphy wrote, "[w]ith the census below 50 and the low revenue, a second clinical administrative position is out of the question right now. I hope this alleviates any ongoing confusion about who is responsible for all clinical functions in the McMinnville location." A copy of that February 5, 2010 email from Murphy to White is attached hereto as Exhibit 14.

126.    Every other office in Murphy's region, however, has at least two full-time employees covering those responsibilities, and two of those offices have a patient census almost identical to McMinnville's patient status. A copy of a March 17, 2010 email regarding "Case Match Stats," showing patient census in Murphy's region is attached hereto as Exhibit 15. In this and other ways, White was being retaliated against and disparately treated from similarly situated others due to her revelations about and refusals to participate in Gentiva's fraudulent activities.

127.    In mid-February, White approached Bacon about his attitude toward her since October 2009. She told Bacon that she felt as though he spoke to her in a dismissive and condescending tone, and that he raised his voice to her at least three times. White also told Bacon that since the October 2009 audit, she had similarly upsetting interactions with Murphy and Lovvorn. White explained to Bacon that she felt humiliated and she asked Bacon how she could repair her relationship with him and others.

128.    Bacon responded by telling White that "it's gone too far," and, "if this comes between your job and my job, Brian Bacon will be here . . . Brian Bacon will be here." Bacon eventually ended the conversation by saying, "you working here is not going to work."

129.    On March 10, 2010, Murphy and Bacon met with White and presented her with a Performance Appraisal for 2009. White predictably received a low score. A copy of that Performance Appraisal is attached hereto as Exhibit 16. Murphy and Bacon also told White that they were carrying out their previous threat by demoting her to the MCP position. Murphy and Bacon presented White with a 60-Day Performance Plan, suggesting that she had 60 days to achieve certain goals or be terminated. A copy of that 60-Day Performance Plan is

attached hereto as Exhibit 17. Several of those goals were unattainable at any branch, let alone a branch with only one nurse working in the office.

130. For example, one of the goals was to "[m]eet final claims release metric of 14 days or less from discharge to release of final claim." The other branch offices in Murphy's region averaged well-over 14 days for the same metric, with the Tullahoma branch office (the other office for which Bacon was responsible) averaging over 29 days for the same metric. A copy of Gentiva Performance Metrics reflecting those metrics is attached hereto as Exhibit 18.

131. Because of the meritless criticism in the Performance Appraisal and the unattainable goals in 60-Day Performance Plan, White told Murphy that she believed she was being treated unfairly because she had pushed for the audit of the psychiatric patients. White explained to Murphy that she requested the audit because she believed that Medicare would shut down Gentiva's McMinnville office if Gentiva did not stop its recertification practices. In response, Murphy asked White, "Why are you staying?" White explained that she was not someone who moved around from employer to employer, that she needed her job and wanted to stay at Gentiva, and did not want to be forced to take a different position with less benefits than she was earning at Gentiva.

132. On March 12, 2010, White met with Edwina Simpson, the HR Director for Murphy's region, and explained that she felt she was being retaliated against for requesting the audit of the psychiatric patients. After White related her experiences, Simpson (like Murphy) asked, "Why are you staying?" When White told Simpson what she had told Murphy, Simpson asked, "Tell me, is pride why you won't leave?"

133. It was clear from the totality of Simpson, Murphy and Bacon's behavior and comments that they were attempting to create an intolerable atmosphere that would encourage White to resign from her employment at Gentiva.

134. After conscientiously working nights and weekends for Gentiva for over a year, White was devastated by her Performance Appraisal, demotion, the 60-Day Performance Plan, and her conversations with Murphy, Bacon and Simpson. She was mentally and physically exhausted, and suffering from severe stress and anxiety. At the direction of her physician, White took FMLA leave for the week of March 13, 2010. A copy of a letter related to White's FMLA leave is attached hereto as Exhibit 19, and a note from Dr. Chris Beckman regarding White's condition is attached hereto as Exhibit 20.

135. On April 14, 2010, just a few weeks after White returned from FMLA leave due to stress and exhaustion, Bacon told White that she had to work late over the weekend in order to finish some paperwork. White was the only Gentiva employee in the McMinnville office already working both nights and weekends. Later that same day, Bacon came to White's office with the 60-Day Performance Plan in his hand, and started to verbally review it with White while her door was open and staff could hear him, further humiliating White.

136. By May 2010, White had compiled personal notes regarding Gentiva's fraudulent schemes and the retaliation she experienced, and was considering her legal options, including the possibility of filing a False Claims Act action.

137. On Wednesday, May 19, 2010, the McMinnville office had a party to celebrate Nurses Day. At 1:30 p.m., Bacon had a meeting with White and reviewed Bacon's

notes on White's 60-Day Performance Plan. Bacon specifically criticized White for not completing her paperwork on time during the weeks of April 21, 2010 and May 13, 2010.

138. Bacon knew that it would be impossible for White to meet those deadlines because she was the only nurse working in the office and had multiple other duties. Despite that knowledge, Bacon had sent White out into the field to do patient visits three Fridays in April, requiring White to miss valuable office time and creating even more paperwork for White to process.

139. On May 19, 2010, Bacon told White that she would absolutely have to have her paperwork complete by May 25, 2010. White explained to Bacon that as the only nurse in the office, she was unable to devote her undivided attention to recordkeeping due to her other job responsibilities, including fielding questions from nurses, therapists and patients. Nonetheless, Bacon attacked White for not working faster, comparing her to Kathy Fisher, a nurse in the Tullahoma office. Bacon stated that Fisher could "lock" 7 OASIS documents each day and asked why White could not match Fisher's productivity. Locking more documents resulted in higher Medicare reimbursements for Gentiva. White reminded Bacon that the comparison to Fisher was unfair because the Tullahoma records were inadequate and not billable to the Government. White made clear that it was important to her that Gentiva not submit ineligible reimbursement requests to the Government. At that point, Bacon said that White raised an important issue, and that Murphy would be in the McMinnville office in one hour. When White asked Bacon if he intended to fire her, Bacon said, "you can think about it."

140. Murphy arrived at approximately 2:30 p.m. and, with Bacon, told White that she was being terminated – she could resign or they would fire her. White said,

"I'm not quitting." Bacon said, "we are terminating the relationship with you and Gentiva." Murphy told White to get her things out of her office and leave the key.

141. The stress of working extremely long hours, with no relief in sight, combined with her unwarranted demotion, discipline and, ultimately her termination, has had a significantly deleterious impact on White's health.

## VIII. GENTIVA'S CORPORATE CULTURE GIVES RISE TO THE WIDESPREAD AND ONGOING FRAUDULENT SCHEMES

142. Through its compensation system, training materials, corporate messaging and internal "audit" procedures, Gentiva has created a corporate culture in which those that perpetrate outright fraud in the name of revenue generation are protected or promoted, while those that report fraud are ostracized, bullied and eventually fired. That corporate culture damages Gentiva's patients, Gentiva's employees, and the public fisc.

### A. Gentiva's Compensation System Pressures Employees to Falsely Certify and Recertify Patients

143. Gentiva's compensation system rewards management employees with bonuses based primarily on increasing patient census and revenue generated per patient.

144. These two metrics, without any corresponding emphasis on corporate compliance, lead Gentiva's management to drive their employees to recruit and recertify patients, and to maximize the visits each patient receives, without regard to whether the services Gentiva provides are reasonable or necessary.

145. Murphy and Bacon, who both received bonuses based, at least in part, upon patient census and revenues generated per patient, drove their employees to recruit, visit and recertify patients without regard to whether those services were appropriate.

146.     Murphy and Bacon pushed their employees both directly (*e.g.*, "avoid LUPAs," and "McMinnville doesn't discharge [patients] until they're dead"), and indirectly through their emphasis on revenue generation.

147.     During weekly telephone conferences involving multiple Gentiva offices, Murphy regularly stressed the need to increase admissions, and praised the offices that were able to increase their patient census. When an office's patient census declined, the office representatives were expected to provide an explanation with the assumption that there was a "problem," rather than the explanation being that patients successfully recovered or stabilized, ending their need for home health services.

148.     Murphy also regularly sent out emails congratulating different offices for their revenue generating achievements, rather than for quality of care issues. For example:

- On June 18, 2009, Bacon wrote in an email to Murphy that "McMinnville continues to do an excellent job of getting revenue in and Vicky reports Qualified Admits are up this week." Murphy responded with praise for all. A copy of this June 18 and 19, 2009 email exchange is attached hereto as Exhibit 21.

- On July 2, 2009, White reported to Murphy that McMinnville was "projecting 7 medicare admits for this week . . . " Murphy responded: "FANTASTIC!!" A copy of that July 2, 2009 email exchange is attached hereto as Exhibit 22.

- On July 17, 2009, Joshua Erhardt, a Gentiva Data Analyst, sent out a ranking report for based upon new patient admissions. He wrote: "There were 3,399 (118) qualified admits for the week ending 7/10 made up of 3,083 Medicare

and 316 Non Medicare PPS admits. . . . Middle Tennessee is #1 for the week at 116.17%." Murphy forwarded that email to her team, expressing her congratulations: "AWESOME RESULTS!! Thanks for driving qualified admissions!!" A copy of that July 17, 2009 email from Murphy is attached hereto as Exhibit 23.

- On August 5, 2009, Bacon sent an email to Murphy summarizing his weekly report. In response, Murphy wrote: "Jamie: Thanks for doing 'whatever it takes"! A copy of that August 5, 2009 email exchange between Murphy and Bacon is attached hereto as Exhibit 11 (emphasis in original).

- Additional examples of Murphy and Bacon emphasizing revenue generation are hereto as Exhibit 24.

149. Notably, Gentiva emphasizes high recertification rates as a key revenue driver.

150. For example, in May 2009, Murphy wrote an email to the managers in her region congratulating Bacon for the financial results in the Tullahoma branch. She wrote: "Brian Bacon and the folks in Tullahoma can squeeze a dollar like nobody else! With a 19% positive variance on net revenue, Brian somehow managed a 51% positive variance on the EBITDA line ytd! If you wonder how he did it, he has dropped his direct cost per visit by $11 per visit since January. *A 49% recert rate helps too.* Thanks Brian for watching all the details!" A copy of that May email from Murphy is attached hereto the as Exhibit 9 (emphasis added).

151. On August 12, 2009, Bacon wrote an email to Murphy and others summarizing his weekly report. He wrote: "McMinnville had excellent revenue, was 2 short on qualified, *but shined with 11 Recerts.* Great job everyone." Murphy replied to everyone:

"Congratulations on the good admission week in Tullahoma!! *Nice recerts all around*!" A copy of that August 12, 2009 email exchange between Murphy and Bacon is attached hereto as Exhibit 25 (emphasis added).

152. The highest level of Gentiva's management emphasizes recertification rates without regard to patient needs. For example, Jeff Shaner, Gentiva's Divisional Vice President, Operations, was a speaker at a Regional meeting in 2008 and, in front of approximately 250 Gentiva employees from Virginia, West Virginia, Tennessee and Kentucky, Shaner praised the McMinnville office specifically for its high recertification rate. Joy McBride, Branch Director of the Smyrna office, was present at this meeting.

153. Further, McBride told White about a July 15, 2010 conference call during which Murphy said that Gentiva's Smyrna and Lebanon offices were not recertifying patients as often as they "should" and, therefore, discharging patients too soon. Murphy stated that, as a result of those low recertification rates, Monica Hullinger, Gentiva's Vice President for the Mid-Atlantic Region, put the Smyrna and Lebanon offices "on the radar."

154. Further still, if Sales Representatives do not meet their Medicare admission target 2 months in a row, they are automatically placed on 60-day probation, creating further incentives to certify patients without regard for their eligibility.

**B. Gentiva's Training Program Places Additional Pressure on Employees to Falsely Certify and Recertify Patients**

155. Gentiva's own written training materials reflect the pressure Gentiva puts upon its employees to certify and recertify patients.

156. For example, a Gentiva training manual entitled "Determining Homebound Status" strongly suggests to employees that too many patients are not being

certified because they are not homebound: "Recently, data shows that many patients are not being admitted and not receiving services that they may otherwise have received because they are 'not homebound.'"

157.    The manual proceeds to inform employees that the default assumption when evaluating patients is that the patient is homebound:  "A good way to evaluate homebound status is to find reasons the patient *is* homebound and let that serve to guide your documentation."  A copy of Gentiva's "Determining Homebound Status" guide is attached hereto as Exhibit 26 (emphasis in original).

**C.    Gentiva's "Audit" Program "Legitimizes" Fraudulent Certifications and Recertification**

158.    Gentiva uses its own audit teams to legitimize Gentiva's fraudulent activities by intentionally overlooking certifications and recertifications that should never have been submitted to the Government.

159.    The September audit is a vivid illustration of the inefficacy of Gentiva's routine audit process.  The fact that Mayson, a Regional Director of Regulatory Services, concluded that the McMinnville's psychiatric patient records revealed no problems, just one month before Thompson conducted her audit and concluded that roughly 80% of McMinnville's Psychiatric patients needed to be discharged, reveals the futility of Gentiva's routine audit procedure.

160.    Gentiva's routine audit procedures not only fail to uncover blatant fraud, but they also intentionally encourage employees, like Young, to believe that their fraudulent schemes are sanctioned, thereby eliminating what should be a critical counterweight to Gentiva's emphasis on revenue generation.

161. Moreover, Gentiva's response to the October audit – slowly discharging fraudulently certified patients to avoid raising any red-flags, and failing to discipline the management employees who directed the fraudulent recertifications – illustrates Gentiva's interest in sweeping under the rug, rather than eliminating, fraudulent schemes.

### D. Gentiva's HR Department Encourages Its Fraudulent Schemes

162. While Gentiva fails to discipline, or even educate, employees (like Young) who openly encourage employees (like Myers) to falsify patient records, Gentiva's HR Department asks employees (like White) why they do not simply resign when they complain that they are being retaliated against by Gentiva management for accurately reporting fraudulent activity. Gentiva's treatment of White, in combination with Gentiva's treatment of Young, sends a clear message to Gentiva employees that reporting fraud will not be tolerated.

163. Gentiva's corporate culture, if left unchecked, will continue to encourage its employees to fraudulently certify and recertify patients at tremendous expense to the Government.

164. Gentiva's corporate culture also creates a tremendous expense for Gentiva's patients who become emotionally dependent upon the non-skilled services Gentiva provides to patients that do not qualify for, or need, HHS, and who become stigmatized and jeopardized by their own medical charts which falsely exacerbate their psychological symptoms.

## COUNT I
### (Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a))

165.   Plaintiff-Relator White realleges and incorporates by reference the allegations made in Paragraph 1 through 163 of this Complaint as though fully set forth herein.

166.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

167.   Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who –

> (1)   knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

> (7)   knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . .

168.   On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

> (1)   any person who –

>> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

>> (G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an

obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

169. Through the acts described above, Gentiva and its agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(A), as amended on May 20, 2009.

170. Through the acts described above, Gentiva and its agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B), as amended on May 20, 2009.

171. Through the acts described above, Gentiva and its agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G), as amended on May 20, 2009.

172. Gentiva knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

173.    The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Gentiva, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Gentiva as alleged herein.

174.    By reason of Gentiva's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### COUNT II
### (Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h))

175.    Plaintiff-Relator White realleges and incorporates by reference the allegations made in Paragraph 1 through 163 of this Complaint as though fully set forth herein.

176.    31 U.S.C. § 3730(h), Relief From Retaliatory Actions, provides:

(1)    In general.— Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)    Relief.— Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

177. White engaged in protected activity by, among other things, reporting to multiple Gentiva supervisors her concerns that Gentiva was submitting illegal, unlawful and/or false claims to the Government in an effort to stop Gentiva from presenting or causing to be presented to the Government false or fraudulent claims for payment or approval, and from making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

178. Gentiva knew that White engaged in the above described protected activity.

179. Gentiva discharged, demoted, threatened, harassed, and otherwise discriminated against White as a result of her protected activities.

180. As a result of Gentiva's unlawful actions, White has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and White has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

## COUNT III
### (Violation of the Tennessee Public Protection Act, Tenn. Code. Ann. § 50-1-304)

181. Plaintiff-Relator White realleges and incorporates by reference the allegations made in Paragraph 1 through 163 of this Complaint as though fully set forth herein.

182. Prior to May 2010, White was employed by Gentiva.

183. White refused to remain silent about Gentiva's submission of illegal, unlawful and/or false claims to the Government.

184. White's refusal to remain silent about Gentiva's submission of illegal, unlawful and/or false claims to the Government served a public purpose in that Gentiva was and is acting in violation of the criminal or civil code of the United States and/or regulations intended to protect the public health, safety or welfare.

185. Gentiva terminated White's employment for refusing to remain silent about Gentiva's illegal activities.

186. As a result of Gentiva's unlawful actions, White has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and White has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

187. Gentiva's conduct was intentional, fraudulent, malicious and/or reckless.

### COUNT IV
### (Wrongful Termination Under Common Law)

188. Plaintiff-Relator White realleges and incorporates by reference the allegations made in Paragraph 1 through 163 of this Complaint as though fully set forth herein.

189. Prior to May 2010, White was employed by Gentiva.

190. Gentiva terminated White's employment because White attempted to exercise a statutory or constitutional right and/or in violation of a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision.

191. White's reporting of, attempts to stop and refusal to remain silent about Gentiva's submission of illegal, unlawful and/or false claims to the Government served a public purpose in that Gentiva was and is acting in violation of the criminal or civil code of the United States and/or regulations intended to protect the public health, safety or welfare.

192. A substantial factor in Gentiva's decision to discharge White was her exercise of protected rights and/or her compliance with clear public policy.

193. As a result of Gentiva's unlawful actions, White has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and White has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

WHEREFORE, Plaintiff-Relator Vicky White, on behalf of the United States of America, demands that judgment be entered against Defendant Gentiva Health Services, Inc. ordering that:

    (a)    Pursuant to 31 U.S.C. § 3729(a), Gentiva pay an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729(a);

    (b)    Relator be awarded her relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(c)      Relator be awarded all costs and expenses of this action, including attorney's fees pursuant to 31 U.S.C. § 3730(d); and

(d)      Relator and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

Further, Plaintiff-Relator Vicky White, on her own behalf, demands that judgment be entered in her favor and against Defendant Gentiva Health Services, Inc. granting the following relief:

(e)      An award of back pay with prejudgment interest;

(f)      An award of two times the amount of back pay, and interest on two times the amount of back pay pursuant to 31 U.S.C. § 3730(h)(2);

(g)      An award of front pay in lieu of reinstatement;

(h)      An award of general damages to compensate White for the mental and emotional distress caused by Gentiva's misconduct;

(i)      An award of punitive damages to deter and punish Gentiva;

(j)      An award of attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h)(2) and Tenn. Code Ann. § 50-1-304(d)(2); and

(k)     An award of such other and further relief as this Court

deems just and proper.

**TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator

Vicky White hereby demands a trial by jury as to all issues.

Dated:  September 7, 2010                Respectfully submitted,

VICKY WHITE

By _____

David J. Chizewer
Michael L. Sullivan
Matthew K. Organ
**GOLDBERG KOHN LTD.**
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000

By _____

R. Louis Crossley, Jr.     BPR # 7096
**LONG, RAGSDALE & WATERS, P.C.**
1111 Northshore Drive; Suite S-700
Knoxville, Tennessee  37919
(865) 584-4040

Attorneys for Plaintiff-Relator Vicky White