**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION AT KNOXVILLE**

United States of America, )
*ex rel.* Vicky White, )
 )
 )
 *Plaintiff-Relator*, )
 ) No.: 3:10-CV-394-PLR-CCS
v. )
 )
Gentiva Health Services, Inc. )
 )
 *Defendant.* )

## Memorandum Opinion and Order

On September 8, 2010, Vicky White filed this *qui tam* action under the federal False

Claims Act, 31 U.S.C. §§ 3729, *et seq.* After the United States declined to intervene, Ms. White

served Gentiva with a summons. Presently before the Court is Gentiva's motion to dismiss for

failure to state a claim. For the reasons that follow, Gentiva's motion is granted in part and

denied in part.

### I. Background

#### A. Legal Background

The False Claims Act imposes civil liability for knowingly presenting or causing to be

presented false or fraudulent claims to the United States Government for payment or approval.

31 U.S.C. § 3729(a)(1)(A). It also imposes liability for knowingly employing a false record or

statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the

government—what is known as a "reverse" false claim. 31 U.S.C. § 3729(a)(1)(G). *See, e.g.*,

*United States ex rel. Winkler v. BAE Sys., Inc.*, 957 F.Supp.2d 856, 876 (E.D. Mich. 2013).

Those who violate the False Claims Act are liable for civil penalties up to $10,000 and treble damages. *Id*. To promote enforcement of the False Claims Act, private individuals (called "relators") can bring *qui tam*[1] actions on behalf of the United States. 31 U.S.C. § 3730(b)(2). After the relator files its complaint, the United States has the option of intervening and conducting the litigation itself. 31 U.S.C. § 3730(b)(4)(B). If the government opts not to intervene, the relator may proceed individually. 31 U.S.C. § 3730(c)(3). Successful relators are awarded a portion of the winnings ranging from 10 to 30 percent depending on the relator's role in the case and whether or not the government chose to intervene. 31 U.S.C. § 3730(d). This award encourages "whistleblowers to act as private attorneys-general in bringing suits for the common good." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009) (quotations omitted).

The False Claims Act's award to the relator has the side effect of encouraging opportunistic plaintiffs to bring parasitic lawsuits in the hopes of profiting from public information. To encourage private citizens to expose fraud while discouraging opportunistic plaintiffs, the False Claims Act bars certain *qui tam* actions, including *qui tam* actions based on allegations that are already the subject of a civil suit to which the government is a party, or *qui tam* actions based on a fraud that has already been publicly disclosed. 31 U.S.C § 3730(e)(4). *See also Poteet*, 552 F.3d at 507.

The False Claims Act applies to claims submitted by healthcare providers to Medicare and Medicaid, "indeed, one of its primary uses has been to combat fraud in the healthcare field." *United States ex rel. Osheroff v. HealthSpring, Inc.*, 938 F.Supp.2d 724, 732 (M.D. Tenn. 2013) (quoting *Chesbrough v. VPA P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)).

---

[1] The Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitar* (often shortened to *qui tam*) means "who as well for the king as for himself sues in the matter." Black's Law Dictionary, 1368 (9th ed. 2009).

2

Medicare beneficiaries who are homebound can receive certain medically necessary services at home. *See* 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A). These services generally include skilled nursing, physical therapy, speech-pathology therapy, and occupational therapy.

Home-health agency's patients are referred for home-health services by their physicians who are required to certify that the patient is under their care, that the physician has established and will periodically review a 60-day plan of care, that the patient is homebound, and that the patient requires one of the types of home-health services that qualifies for Medicare. After receiving a patient referral, a home-health agency is required to provide its own patient-specific, comprehensive assessment, called an Outcome and Assessment Information Set ("OASIS"). 42 C.F.R. § 484.55. During this initial assessment, the home-health agency must determine the immediate care and support needs of the patient, and, for Medicare patients, determine eligibility for the Medicare home health benefit, including homebound status. *Id.*

A 60-day plan of care is called an "episode." After each episode, a patient must be recertified to receive funds from Medicare. To be recertified, the patient's physician must review and sign the patient's plan of care, making any necessary changes, and the home-health agency must complete a new assessment, and determine that the patient is still eligible to receive Medicare-funded home-health services.

A Medicare beneficiary is homebound if, due to underlying illness or injury, the beneficiary has conditions that restrict the ability to leave the home. Medicare Benefit Policy Manual, ch. 7, § 30.1.1. Homebound status does not require a beneficiary to be bedridden; instead a beneficiary is considered homebound if leaving their residence requires considerable or taxing effort. *Id.*

Home-health agencies are not paid per service rendered. Instead, Medicare pays them

under a prospective payment system that provides a predetermined amount for the entire 60-day episode. *See* 42 U.S.C. § 1395fff(a); 42 C.F.R. § 484.205(a). Adjustments are made to a standard national episode rate to account for the type of care the patient requires as well as the geographic location. *See* 42 U.S.C. §§ 1395fff(b)(4)(B), 1395fff(b)(4)(C). These adjustments are made based on the OASIS forms, which are submitted to the government through a Medicare administrative contractor or fiscal intermediary for payment.

Certain additional adjustments are made to the reimbursement rate, including a "Low Utilization Payment Adjustment" and a "Therapy Threshold." The reimbursement rate is subject to a Low Utilization Payment Adjustment when the home-health agency visits the patient four or fewer times during a 60-day episode. In such a situation, Medicare will calculate its payment using a per-visit amount. A Therapy Threshold is just the opposite of a Low Utilization Payment Adjustment. When a home-health agency reaches a certain number of visits during a given 60-day episode—the Therapy Threshold—Medicare will increase the reimbursement paid on the patient's behalf.

Medicare conditions payment on the physician's certification that the beneficiary is homebound and in need of skilled services. 42 C.F.R. § 409.41(b). Medicare also conditions payment on the beneficiary *actually* being homebound and *actually* needing skilled services. 42 C.F.R. § 409.41(c) (conditioning payment on all requirements contained in §§409.42-409.47 being met, including 42 C.F.R. § 409.42(a)). Additionally, Congress has statutorily prohibited the payment of any Medicare claim for services that are not medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

## B. Factual Allegations

Gentiva Health Services is a home-health agency that provides home-health services to more than 350,000 patients nationwide. In 2009, Gentiva received approximately 80 percent of its home-health revenues from Medicare and Medicaid. The relator, Vicky White, is a registered nurse who has worked in the healthcare industry for her entire professional career (beginning in 1976). In late 2008, Ms. White accepted a job-offer from Gentiva to work as a Director of Clinical Operations and Services. She reported to Brian Bacon, a Branch Director who headed Gentiva's McMinnville and Tullahoma, Tennessee offices. Mr. Bacon reported to Deana Murphy, the Area Vice President.

Though she was hired to work in Gentiva's McMinnville office, Ms. White spent her first six weeks at Gentiva in their Tullahoma facility so she could receive software training. Afterwards, she returned to Tullahoma from time to time to help the Tullahoma office audit patient files by reviewing OASIS and other documents created by nurses and therapists. In late 2009, Ms. White began reviewing and "locking" OASIS documents for the McMinnville office so the government could access those records in connection with the reimbursement process.

### i. Certification and Recertification of Ineligible Patients

One of Ms. White's responsibilities as the Director of Clinical Operations and Services in the McMinnville office was to review patient records to ensure they were complete and the patients qualified for home healthcare. Ms. White found that many of the psychiatric patients' charts indicated the patients were stable—either because the patient was not experiencing symptoms or because the symptoms were minimal and not disrupting the patient's life. Because these patients were stable, they were not eligible for home-health services. Despite this, Gentiva continued to recertify these ineligible patients time and time again.

The psychiatric nurses were required to share their reports with Bridget Freeze, the Manager of Clinical Practice in the McMinnville office, who would review and certify them. Ms. White observed that Freeze was certifying and recertifying patients for home-health services without reviewing the psychiatric patients' charts. Ms. White approached Ms. Freeze about this observation. Ms. Freeze explained that Jo Ellen Young and Jimmie Webb, both nurses in the McMinnville office, had worked together to establish and grow the psychiatric-patient program in the McMinnville office, and that Ms. Freeze did not feel comfortable complaining to Webb about the psychiatric patients' charts.

So Ms. White spoke with Webb herself. She explained that many patients had been recertified six or more times despite charts indicating the patient was stable. Webb told Ms. White Gentiva had, on several occasions, audited these records and not uncovered any issues. He said, "if it ain't broke, don't fix it," and instructed Ms. White not to bring it up again. According to Ms. White, Jimmie Webb received bonuses from Gentiva based at least partly on the patient census at McMinnville.

In the course of her work, Ms. White learned that some of the psychiatric nurses were actively falsifying patient charts to avoid a physician recognizing, or an audit revealing, a patient was in stable condition and therefore ineligible for home-health services. To accomplish this, the psychiatric nurses would add or exacerbate certain facts in the patient's charts to suggest the patient's condition had changed or deteriorated. Based on the change, the patient could be recertified for an additional 60-day episode.

In September 2009, Leslie Myers, another nurse in Gentiva's McMinnville office, told Jo Ellen Young she planned to discharge one of the psychiatric patients because the patient was stable and not having any delusions of hallucinations. Young instructed Myers not to discharge

6

the patient, explaining it was Gentiva's practice to keep psychiatric patients recertified as long as possible. Myers persisted that the patient did not qualify for recertification, prompting Young to explain "[t]his is the way we do it – we pull out a delusion or hallucination at the end of the cert, then exacerbate the schizophrenia, then recert." Ms. White reported this incident to Brian Bacon, the Branch Director of the McMinnville office, and Deana Murphy, the Area Vice-President; however, Ms. White is not aware of anyone ever disciplining or even speaking to Jo Ellen Young about falsifying patient records or encouraging others to falsify patient records.

According to Ms. White, this was not an isolated incident. Gentiva persistently certified patients for new 60-day episodes despite the patients' ineligibility. According to a weekly census report, Gentiva recertified patients (in McMinnville) between 50 and 70 percent of the time. [Complaint, Ex. 1]. To this effect, Brian Bacon, the Branch Director for McMinnville, repeatedly joked in front of Ms. White and other staff that "McMinnville doesn't discharge [patients] until they're dead." The high rate of psychiatric recertification resulted in the McMinnville office having "a grossly disproportionate number of psychiatric patients in its census." In 2009, over 60 of McMinnville's 125 patients were psychiatric patients.

In addition to the improper psychiatric recertifications, Ms. White alleges that Gentiva certified and recertified patients who were ineligible for home-health services because they were not homebound or did not require (or receive) skilled-nursing care—both necessary conditions for Medicare payment. These patients included one who drove her car every day for reasons unrelated to her medical care. When one therapist did not admit the patient because she was not homebound, Mr. Bacon sent a different clinician to visit the patient who did admit her. One of the nurses confirmed to Ms. White that this was Gentiva's policy—at the Tullahoma office "they

tell [them] not to discharge patients because they are not homebound."[2]

Ms. White also claims she reviewed five patients' charts who were receiving home-health services only to find that none of them were receiving skilled-nursing care. She reported this problem to Mr. Bacon, who said he would look into it. In September 2009, Ms. White accompanied Gentiva's Regional Director of Regulatory Compliance on a home visit during an annual internal audit where they observed a psychiatric nurse treat a patient. Apparently the "skilled-nursing care" utilized that day was an instruction to the patient to "look at a picture on the wall and think happy thoughts." The Director of Regulatory Compliance thought the visit went well, and was not concerned about a lack of "skilled-nursing care."

### ii.    Improper Marketing and Patient Visit Policies

Ms. White contends that, in addition to certifying and recertifying ineligible patients for home-health services, Gentiva boosted its revenue by directing its nurses to visit patients with the frequency that maximizes revenue without regard to the medical necessity of the visits. Mr. Bacon repeatedly told the McMinnville staff to avoid Low Utilization Patient Adjustments. In other words, staff should endeavor to visit patients at least five times during any 60-day episode to avoid a downward adjustment to Gentiva's reimbursement from Medicare. Also, because Gentiva's reimbursement rate would be increased upon reaching a "Therapy Threshold," management actively encouraged staff to meet these target numbers of visits without regard to

---

[2] In further support of Ms. White's contention that Gentiva certifies and recertifies patients who are not homebound, she notes that in Gentiva's manual entitled "Determining Homebound Status," it is strongly suggested to employees that too many patients are not being certified because they are not homebound:

"Recently, data shows that many patients are not being admitted and not receiving services that they may otherwise have received because they are 'not homebound.'"

The manual goes on to state:

"A good way to evaluate homebound status is to find reasons the patient _is_ homebound and let that serve to guide your documentation." Complaint, Ex. 26, pp.1, 5.

medical justification.

In another attempt to boost its patient census, Ms. White contends that Gentiva inappropriately marketed unnecessary services to the elderly. In McMinnville, Jo Ellen Young solicited the elderly by knocking on their doors and asking if they would be interested in having someone come visit them. If the resident—who typically lived alone—indicated they would like a visit, Young would obtain their Medicare information and their physician's name so she could arrange for the patient to be referred to Gentiva.

### iii. Internal Audits

In September 2009, Gentiva conducted a routine internal audit of McMinnville's records that did not identify any problems. Accordingly, Ms. White "redoubled her efforts to have Gentiva conduct a formal audit of the psychiatric patient charts in McMinnville." Her persistence paid off in October 2009, and Gentiva conducted a three-day audit of McMinnville's psychiatric patient records.

The auditors found many of the patients' records indicated they were stable or not receiving any skilled-nursing service. In total, they found 50 of the 60 psychiatric patients on McMinnville's census were ineligible for home-health services and needed to be discharged. The auditors returned to the McMinnville office the following week to train the psychiatric nurses on the certification and recertification process. Gentiva did not immediately discharge the 50 psychiatric patients found to be inappropriately recertified, nor did it reimburse the government for any reimbursements already paid on improperly recertified patients. Instead, the psychiatric nurses were instructed to recertify the patients that were already near the end of their 60-day episode and to gradually discharge the ineligible patients.

The nurses were instructed to falsely certify patients near the end of their episode and

slowly discharge ineligible patients because an abrupt 40 percent decline in the McMinnville office's census would have thrown up red flags, making discovery of the improper recertifications more likely. By December 2009, McMinnville was only treating five or six psychiatric patients—a 90 percent decline from the October 2009 audit. The McMinnville office's total revenue decreased from $207,581 in July 2009 to $127,764 by the end of December 2009.

### iv. Ms. White's Termination

During the first nine months of her employment at Gentiva, Ms. White received regular praise from her supervisors. Deana Murphy, the Area Vice President, sent an email praising Ms. White in May 2009, stating "Vicky White in McMinnville has done a great job since coming aboard! . . . Nicely done Vicky!" In August, Murphy wrote again stating "Congratulations to Vicky, Monica, and the whole team in McMinnville for a strong performance in July." Ms. White was praised on several other occasions by Mr. Bacon and Ms. Murphy in addition to the praise Ms. White received from patients.

In October 2009, the same month the audit Ms. White requested discovered the improper recertifications, Mr. Bacon terminated Bridget Freeze—the Director of Clinical Operations who had been certifying and recertifying patients without reviewing their charts. Instead of filling Freeze's old position, Bacon and Murphy asked Ms. White to take on the extra responsibilities. When she asked why they weren't planning to fill the position, Murphy and Bacon told Ms. White the reduced patient census caused by the discharge of ineligible psychiatric patients meant additional help was not warranted.

In January 2010, Murphy and Bacon informed Ms. White they were considering demoting her, but did not offer specific reasons why. Thereafter, Bacon and Murphy frequently

criticized Ms. White without justification. Ms. White approached Mr. Bacon in mid-February concerning his attitude toward her. She explained she felt he spoke to her in a dismissive and condescending tone, and that he raised his voice to her at least three times. She also explained that, since the October 2009 audit, she had similarly upsetting interactions with Murphy and another employee. She felt humiliated. Ms. White asked Mr. Bacon how she could repair her relationship with him and others. Mr. Bacon responded, "it's gone too far . . . if this comes between your job and my job, Brian Bacon will be here . . . Brian Bacon will be here." He ended the conversation by stating, "you working here is not going to work."

On March 10, 2010, Murphy and Bacon met with Ms. White and presented her with a performance appraisal for 2009 in which Ms. White received a very low score. Murphy and Bacon then gave Ms. White a 60-day performance plan that set several "unattainable" goals. Ms. White told her supervisors she believed the criticism in the performance appraisal was unmerited and the goals in the performance plan unattainable. She believed she was being treated unfairly because she had pushed for the audit of the psychiatric patients. In response, Murphy asked "Why are you staying?"

Ms. White explained her concerns to the human resources director for her region. The human resources director said the same thing as Murphy—"Why are you staying? . . . is pride why you won't leave?" Finally in late May, when Ms. White failed to meet the (allegedly unattainable) performance goals set by Bacon and Murphy, they fired her. Ms. White alleges the criticism, low performance scores, unattainable performance goals, and eventual termination were all retaliation due to her push for an audit of the psychiatric patients.

### C.  Procedural Background

In accordance with 31 U.S.C. §3730(b)(2), Ms. White filed her complaint *en camera* and

under seal on September 8, 2010. [Docket No. 1]. The complaint includes four counts: (1) violation of the Federal False Claims Act, 31 U.S.C. § 3729(a); (2) violation of the Federal False Claims Act, 31 U.S.C. § 3730(h), for "reverse" false claims; (3) violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304; and (4) wrongful termination under Tennessee law.

Over the course of the next two-and-a-half years, the case remained sealed while the United States investigated Ms. White's numerous allegations.[3] On April 5, 2013, the United States elected not to intervene, and the case was unsealed on April 12, 2013. [Docket No. 27]. Ms. White thereafter served Gentiva with the complaint and summons. Gentiva moved to dismiss Ms. White's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure on September 6, 2013.

Gentiva contends Ms. White's complaint must be dismissed under the False Claims Act's public disclosure bar; that her complaint fails to plead the False Claims Act violations with particularity; a substantial part of Ms. White's claims are based upon certain federal conditions of participation in federal healthcare programs, which, according to Gentiva, cannot provide the basis for pleading a violation of the False Claims Act; and Ms. White's retaliatory termination claims fail as a matter of law.

## II. Standard of Review

Gentiva brought its motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rules 8(a) and 12(b)(6) require the complaint to articulate a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requirement is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[3] The investigation was extensive and involved the United States Department of Justice, Department of Health and Human Services Office of the Inspector General, the Defense Criminal Investigation Services, the Federal Bureau of Investigation, and the Securities and Exchange Commission. [Docket No. 14].

liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A motion to dismiss under Rule 12(b)(6) requires the court to construe the complaint in the light most favorable to the plaintiff, accept all the complaint's factual allegations as true, and determine whether the plaintiff can prove no set of facts in support of the plaintiff's claims that would entitle the plaintiff to relief. *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir. 1990) *cert. denied,* 498 U.S. 867 (1990).

The court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall,* 898 F.2d 1196, 1198 (6th Cir. 1990); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir. 1995) (noting that courts should not weigh evidence or evaluate the credibility of witnesses). The court must liberally construe the complaint in favor of the party opposing the motion. *Id.* However, the complaint must articulate more than a bare assertion of legal conclusions. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434 (6th Cir. 1988). "[The] complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* (citations omitted).

If, in a Rule 12(b)(6) motion to dismiss, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Wysocki v. IBM*, 607 F.3d 1102, 1104 (6th Cir. 2010). Here, the parties have submitted matters outside the pleadings in support of some of their positions. Specifically, Gentiva has submitted the affidavit of Matthew M. Curley along with a number of evidentiary exhibits in support of its argument that the public disclosure bar applies to this action. Consequently, the Court will consider those arguments under Rule 56.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002). Courts may not resolve genuine disputes of fact in favor of the movant. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (vacating lower court's grant of summary judgment for "fail[ing to] adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotations and citations omitted).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in

14

other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

### III. Discussion

**1. Public Disclosure Bar**

Gentiva argues that Ms. White's complaint is barred by the False Claims Act's public disclosure bar. The Court must dismiss an action or claim brought under the False Claims Act if substantially the same allegations or transactions alleged by the relator were publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party; in a congressional, Governmental Accountability Office, or other federal report, hearing, audit or investigation; or by the news media unless the person bringing the action is an original source of the information. 31 U.S.C. § 3730(e)(4)(A). An original source is an individual who either voluntarily disclosed to the government the information on which the allegations or transactions in the claim are based prior to the public disclosure *or* one who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the government prior to filing their action. 31 U.S.C. § 3730(e)(4)(B).

A *qui tam* action or claim is barred by the public disclosure bar if there was a prior disclosure that was (1) public, and (2) revealed substantially the same kind of fraudulent activity against the government as the relator alleges. *Osheroff*, 938 F.Supp.2d at 732 (citing *Poteet*, 552 F.3d at 511). Gentiva submitted two *Wall Street Journal* articles, a press release from the United States Senate Committee on Finance, a letter from the Senate Finance Committee to Gentiva's CEO, and a Gentiva press release as evidence that substantially the same allegations as brought

by Ms. White were previously publicly disclosed. There is no doubt that the information contained in Gentiva's exhibits was publicly disclosed. Thus, the Court turns to whether these public disclosures revealed "substantially the same allegations or transactions as alleged" by Ms. White.

Ms. White's complaint alleges Gentiva engaged in five different fraudulent schemes, including: (1) fraudulently recertifying psychiatric patients; (2) improperly certifying and recertifying patients who were not homebound; (3) improperly recertifying patients who did not need or receive skilled-nursing services; (4) conducting patient visits to meet reimbursement thresholds; and (5) improperly marketing unnecessary home-health services to the elderly. It is clear from a review of Gentiva's exhibits that Gentiva's alleged practice of conducting patient visits to meet reimbursement thresholds and its improper marketing practices were publicly disclosed. On the other hand, nothing in the record supports the conclusion that the remainder of Ms. White's allegations were publicly disclosed.

Gentiva's first exhibit is an April 26, 2010 *Wall Street Journal* article detailing its investigation into the billing practices of some of the nation's largest home-healthcare agencies (including Gentiva). [Curley Ex. G]. The article concludes that the number of in-home-therapy visits provided by these home-healthcare agencies closely track Medicare's reimbursement thresholds. According to the article, home-health agencies often conducted patient visits that were not medically necessary to reach reimbursement thresholds.

The April 26, 2010 *Wall Street Journal* article prompted the Senate Finance Committee to initiate an investigation, and on May 12, 2010, the Senate Finance Committee sent Gentiva a letter noting that "[t]he Medicare data reviewed for the [*Wall Street Journal*] article suggests [home-health agencies] intentionally increased utilization for the purpose of triggering higher

16

reimbursements." [Curley Ex. H]. The letter went on to state that the findings reported in the *Wall Street Journal* were of great concern to the Committee because they suggest home-health agencies were basing the number of therapy visits they provide on how much Medicare will pay as opposed to the best interests of the patients. Finally, the letter requested Gentiva produce documents related to this scheme.

On May 13, 2010, the Senate Finance Committee issued a press release announcing the Committee was investigating the relationship between the number of home-health therapy visits and Medicare's reimbursements for the four largest for-profit home-health agencies (including Gentiva) and the marketing tactics employed by these agencies. [Curley Ex. I]. The same day, the *Wall Street Journal* published a follow-up article noting that the Senate Finance Committee launched an investigation into whether the four largest home-health agencies "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements." [Curley Ex. J].

Finally, Gentiva issued a press release on July 29, 2010 announcing that the Securities and Exchange Commission launched an investigation into Gentiva believed to be similar to the Senate Finance Committee's ongoing investigation. [Curley Ex. K]. The press release did not go into any more detail on the precise nature of the SEC's investigation.

Gentiva argues the public disclosures show that the *Wall Street Journal* and federal government were investigating whether Gentiva "provided medically unnecessary home health services to patients during the time period at issue." Likewise, Gentiva argues, the core of Ms. White's complaint is that Gentiva provided medically unnecessary home-health services. Thus, the public disclosures were of substantially the same allegations as those in Ms. White's complaint.

17

At the level of generality with which Gentiva describes the allegations, it is difficult to reach any conclusion other than all Ms. White's allegations were publicly disclosed before she brought her lawsuit. A more accurate reading of Ms. White's complaint and the public disclosures submitted by Gentiva reveals, however, that of the five fraudulent schemes alleged, only two were publicly disclosed.

A public disclosure will be sufficient to trigger the False Claims Act's bar if it contains sufficient information to put the government on notice of the likelihood of related fraudulent activity. *Poteet*, 552 F.3d at 512. However, when the public disclosures put the government on notice of a particular fraudulent scheme, a *qui tam* claim based on a separate, undisclosed scheme would not be barred. *See Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004).

In *Dingle*, the Sixth Circuit discussed a hypothetical situation where an auto manufacturer is sued specifically for fraud relating to a car's seats. A second suit, alleging fraud with respect to the same car's engine would not be precluded by the first so long as "both suits alleged the respective frauds (and only those frauds) with particularity." *Id.* On the other hand, if there were first multiple *general* allegations of fraud made by public sources relating to the car, a later-filed suit alleging fraud with respect to that car's engine would be barred. To allow the suit in the second scenario to proceed "would allow potential *qui tam* plaintiffs to avoid the public disclosure bar by pleading their complaints with more and more detailed factual allegations slightly different from more general allegations already publicly disclosed." *Id.* The *Dingle* Court concluded that, "[g]iven that the purpose of the *qui tam* action is to prosecute fraud of which the government is unaware, such a result would not advance Congress' purpose, and would only multiply the number of parasitic *qui tam* actions pursued by plaintiffs." *Id.* (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994)).

18

To adopt the *Dingle* Court's hypothetical—the present case is analogous to one where public disclosures revealed sufficient information to put the government on notice that an auto manufacturer committed fraud with respect to a car's seats and engine (the Therapy Thresholds and marketing tactics). Ms. White's suit would be akin to the later *qui tam* plaintiff alleging fraudulent schemes relating the car's seats, engine, transmission, brakes, and airbags. The first two allegations were publicly known, and should therefore be barred by 31 U.S.C. § 3730(e)(4); however, the other three alleged schemes (fraudulent recertification of psychiatric patients, fraudulent certification of non-homebound patients, and fraudulent certification of patients not in need of or not receiving skilled-nursing care) are sufficiently independent of the publicly disclosed allegations to survive the False Claims Act's public disclosure bar.

It does not necessarily follow that, because the government was aware that Gentiva was maximizing revenue by targeting reimbursement thresholds (within an episode of care) without regard to medical necessity, the government was also aware or would inevitably become aware of Gentiva's schemes to certify and recertify ineligible patients for additional episodes of care. None of the public disclosures mention these schemes or detail any facts to put the government on inquiry notice. To the contrary, the public disclosures are tightly focused on allegations that the subject home-health agencies were clustering their visits-per-episode around reimbursement thresholds. Nothing in the record indicates the government had notice of the schemes alleged by Ms. White relating to the fraudulent certification and recertification of patients. Thus, allowing those allegations to go forward is consistent with the public disclosure bar's purpose of preventing parasitic lawsuits based on facts of which the government was already aware.

## 2. Original Source

Because only Ms. White's allegations relating to Gentiva's fraudulent marketing

19

practices and Gentiva's efforts to meet reimbursement thresholds were publicly disclosed, the Court only considers if Ms. White is an original source of those allegations.

For the purposes of the False Claims Act, an original source is an individual who has voluntarily disclosed to the government the information on which the allegations or transactions in a claim are based *prior* to a public disclosure or one who has knowledge independent of and materially adding to the publicly disclosed allegations and who has voluntarily provided the information to the government before filing the action. 31 U.S.C. §3730(e)(4)(B). Ms. White does not allege that she disclosed any information to the government prior to the public disclosures. Instead, she contends that she has independent knowledge that materially adds to the already publicly disclosed allegations. The Court finds Ms. White did allege some independent knowledge of Gentiva's schemes to meet Therapy Thresholds and improperly market its services; however, Ms. White has not alleged anything materially adding to the publicly disclosed allegations.

Ms. White's Therapy Threshold allegations offer little more than the government could learn by reading the April 26 *Wall Street Journal* article. [Curley Ex. G]. Her complaint alleges Mr. Bacon repeatedly told the McMinnville staff to avoid Low Utilization Patient Adjustments by visiting patients at least five times per episode. Ms. White claimed Gentiva strongly encouraged its employees to meet Medicare's reimbursement thresholds, and as Medicare changed the thresholds, the number of visits encouraged by management changed as well. These allegations almost identically track those found in the April 26 *Wall Street Journal* article. The article explained that as Medicare changed the reimbursement thresholds, the average number of patient visits per episode changed to meet the new thresholds. It also explained that management pressured staff to meet these targets regardless of medical necessity. Ms. White's allegations

20

provided illustrative examples of specific behavior that the public disclosures already described with specificity. Such information does not materially add to the publicly disclosed allegations. *See United States ex rel. Beauchamp v. Academi Training Center, Inc.*, 933 F.Supp.2d 825, 843 (E.D. Va. 2013).

As for Gentiva's fraudulent marketing practices—Ms. White tells about staff knocking on elderly people's doors and asking if they—who often live alone—would like somebody to come visit them from time to time. When the elderly person said they would like a visitor, Gentiva obtained their physician's contact info and arranged to get them certified for home healthcare. This allegation does not, however, materially add to the already publicly disclosed information. The Senate Finance Committee already expressed concern that Gentiva was "using marketing tactics to target seniors 65 years old and older so the companies could take advantage of Medicare payments to improve profits." [Curley Ex. I]. The Senate Finance Committee requested Gentiva provide marketing materials, guidelines for patients and physicians, and the clinical criteria used in developing the materials. Ms. White has not pled independent knowledge that materially adds to the ongoing Senate investigation.

Because Ms. White's allegations, that Gentiva fraudulently boosted patient visits to meet Medicare reimbursement thresholds without regard to medical need and improperly marketed its services to elderly individuals, were publicly disclosed, and because Ms. White is not an original source under 31 U.S.C. § 3730(e)(4)(B), Gentiva's motion for summary judgment will be granted with respect to these two claims.

### 3. Adequacy of pleading under FRCP 9(b)

Gentiva contends that Ms. White has failed to plead her claims with the particularity required by Federal Rule of Civil Procedure 9(b). Complaints brought under the False Claims

Act must be pled with particularity under Rule 9(b), which requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting the fraud or mistake." *See, e.g., Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). The purpose of this rule is to give defendants notice "as to the particulars of their alleged conduct" so they are able to respond. *Chesbrough*, 655 F.3d at 466 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007)). Additionally, Rule 9(b) is meant to prevent "fishing expeditions, . . . to protect defendants' reputations from allegations of fraud, . . . and to narrow potentially wide-ranging discovery to relevant matters." *Id.* (internal quotation omitted) (citing *Bledsoe*, 501 F.3d at 502; *United States ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 504 (6th Cir. 2008)).

To state a claim with particularity, a plaintiff must allege: (1) the time, place, and content of the misrepresentation; (2) the fraudulent scheme; (3) the defendant's fraudulent intent; and (4) the resulting injury. *Id.* (citing *Bledsoe*, 501 F.3d at 504). To satisfy the first element, the plaintiff must "include an averment that a false or fraudulent claim for payment or approval has been submitted to the government." *Bledsoe*, 501 F.3d at 504. The *Bledsoe* Court explains that a relator cannot meet this standard without pointing to specific false claims that violate the False Claims Act. *Id.* at 505.

The *Bledsoe* Court noted, however, that it did not mean to foreclose the possibility of a court relaxing this strict rule "in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator." *Id.* at 504 n.12. Since *Bledsoe*, the Sixth Circuit addressed this standard in *Chesbrough*, 655 F.3d at 471, where the Court suggested "the requirement that a relator identify an actual false claim may be relaxed

when, even though the relator is unable to produce an actual billing or invoice, he or she has pled

facts which support a strong inference that a claim was submitted." A "strong inference" may

arise where the relator has personal knowledge that the claims were submitted by the defendants

for approval or payment. *Id.* (citing *United States ex rel. Lane v. Murfreesboro Dermatology*

*Clinic, PLC*, 2010 WL 1926131, *5 (E.D. Tenn. May 12, 2010)); *see also United States ex rel.*

*Gale v. Omnicare, Inc.*, 2012 WL 4473265 (N.D. Ohio Sept. 26, 2012).

      *Lane* is particularly instructive. In *Lane*, the relator was a billing specialist who worked

for a dermatology clinic. She alleged the defendant engaged in a number of false billing patterns

through which fraudulent claims were submitted to Medicare. One of the patterns involved

designating all patients undergoing cosmetic procedures as having an "irritated" condition to

avoid Medicare's restriction from funding purely cosmetic procedures. The defendant moved to

dismiss, arguing that, because the relator failed to plead a specific claim the defendant submitted

to the government for payment, her complaint must be dismissed. *Lane*, 2010 WL 1926131 at

*3. The relator responded "that she has personal knowledge of the false billing patterns by virtue

of her employment as a billing specialist" for the defendant, but she could not "provide detail as

to specific claims because all of the information is under [the defendant's] control and she is no

longer employed in that position." *Id.* at *4.

      Judge Mattice held that the relator's allegations in *Lane* fell "squarely into the situation

that the Sixth Circuit acknowledged, but did not reach in *Bledsoe*." *Id.* at *6 (citing *Bledsoe*, 501

F.3d at 504 n.12). According to *Bledsoe*, a generalized allegation of a scheme—like "the

hospital submits false claims to Medicare"—does not give the defendant notice of the fraudulent

conduct charged and "could be more of a fishing expedition." *Id.* (citing *Bledsoe*, 501 F.3d at

510). But the relator in *Lane* did not allege such a generalized scheme; she pled the nature of the

fraudulent schemes, the time period during which the schemes took place (during the time the plaintiff was employed by the defendant), the content of the false claims (the "irritated" condition claim), the particular office where the alleged fraud occurred, and the injury resulting from the fraud (causing the government to pay the defendant more than properly owed). *Id.*

One of the reasons the relator in *Lane* was unable to produce specific detail of an allegedly false claim was because she no longer worked for the defendant and thus did not have access to the defendant's billing information. The Court found this to be a compelling reason for not producing a specific false claim. *Id.* Judge Mattice concluded that the *Lane* plaintiff had provided sufficient detail, under Sixth Circuit precedent, to permit the defendant to fashion a responsive pleading, and denied the defendant's motion to dismiss. *Id.* at *7.

Ms. White's allegations relating to Gentiva's fraudulent recertification of psychiatric patients is analogous to the allegations in *Lane*. Ms. White alleged in detail a fraudulent scheme to repeatedly recertify ineligible psychiatric patients for home-health services. She explained that nurses regularly falsified patient charts to support recertification, that management joked that Gentiva "doesn't discharge [patients] until they're dead," and that Gentiva conducted an internal audit, found 50 of 60 psychiatric patients ineligible for home-health services under Medicare, yet it recertified those near the end of an episode to avoid calling attention to the matter and having to repay the government the amounts Medicare paid Gentiva for the ineligible patients. Ms. White also specified the time period during which this fraudulent conduct took place—from January 2009 when Ms. White began working at Gentiva through December 2010 when Gentiva discharged the remaining ineligible psychiatric patients. Ms. White alleged the content of the false claims—OASIS reports and patient charts falsely stating that patients were eligible for home-health services; the particular office where the fraud occurred—Gentiva's

McMinnville office; and the injury resulting from the false statements—Medicare paid money to Gentiva that Gentiva did not have a right to receive and Gentiva retained money it should have returned to Medicare when it conducted the audit and realized it had been billing Medicare for ineligible patients.

Also like in *Lane*, only the defendant has custody of its billing records. Ms. White can only allege that she had personal knowledge of the false billing patterns—specifically, she routinely reviewed and "locked" OASIS documents to be submitted to Medicare. These documents served as the basis for determining the Medicare reimbursement rate for a patient's episode of care.

Ms. White has pled the fraudulent-recertification-of-ineligible-psychiatric-patients scheme with sufficient particularity to allow Gentiva to formulate a responsive pleading and create a "strong inference" that Gentiva submitted a false claim. Gentiva's motion to dismiss will be denied with respect to this scheme (for both the 3729(a)(1)(B) and 3729(a)(1)(G) claims).

Unlike the psychiatric recertification scheme, Ms. White's complaint does not plead the two remaining schemes with the requisite particularity. In regards to the allegation that Gentiva improperly certified and recertified non-homebound patients, Ms. White fails to allege personal knowledge of false invoices being submitted for payment. Instead, she discusses two patients who were certified as homebound despite frequently driving their cars. Being bedridden is not necessary for a patient to be homebound; a homebound patient may still leave the home occasionally under certain circumstances. There is not enough factual information in the complaint to determine whether these two patients failed to meet the homebound requirements. Without this fundamental information, this allegation cannot survive Rule 9(b)'s more stringent pleading requirements.

Ms. White's allegation regarding Gentiva's scheme to certify and recertify patients who did not need or receive skilled-nursing care also fails to meet Rule 9(b)'s particularity requirement. Ms. White fails to adequately allege the fraudulent scheme. She simply alleges while she was in Tullahoma (for her first six weeks on the job), she was "shocked by the documentation she reviewed," revealing that Gentiva routinely recertified patients who did not need to receive skilled-nursing care. Ms. White explains that she later reviewed five Tullahoma patients' charts and "discovered that none of the five patients were eligible for HHS. . . . [because] no identifiable skilled service [was] being provided to these patients." Finally, Ms. White tells of observing a nurse treat a psychiatric patient by telling the patient to look at a picture on the wall and think happy thoughts.

This is not enough information to support an allegation of a fraudulent scheme to charge Medicare for unskilled home-health services. Though she alleges the general time and place of the misrepresentation, a conclusory statement that Gentiva billed Medicare "for providing unnecessary HHS to each of these patients" does not sufficiently plead the content of the misrepresentation. There are not enough facts to support a conclusion that the patients were not receiving skilled care. Ms. White doesn't specify what kind of care these patients were receiving, and in the one specific example she gives of a patient being told to think happy thoughts, it could be that the patient received skilled care at other times. Finally, Ms. White fails to allege Gentiva's fraudulent intent. Unlike the psychiatric-recertification scheme where nurses often falsified patient charts to support recertification, there is no indication that Gentiva was intentionally fraudulently certifying patients who were not in need of skilled care. There is only the conclusory allegation that some patients did not receive skilled care, but Gentiva billed Medicare for them nonetheless. Because Ms. White fails to allege this scheme with the

specificity required by Rule 9(b), it will be dismissed.

**4. Conditions of Participation Defense**

Gentiva argues that it cannot be sued under the False Claims Act for failing to meet Medicare's conditions of participation. It contends "Ms. White's allegations are based, in significant part, upon her contention that Gentiva violated conditions of participation rather than conditions of payment," and violations of conditions of participation are not material to the government's decision to pay claims for reimbursement, and therefore, cannot provide a basis for pleading a False Claims Act violation.

The complaint does cite two regulations that condition Medicare participation on compliance with all federal, state, and local laws and regulations as well as accurate transmission of OASIS data to state agencies; however, Gentiva has cherry-picked these two statements from an introductory portion of the complaint giving background on how the Medicare certification process works. It is clear that Ms. White's False Claims Act allegations are not predicated on Gentiva's violation of conditions of participation, but are based instead on the fact that Gentiva sought and obtained payment from the government for services provided to ineligible patients.

As discussed above, Medicare conditions payment on the beneficiary *actually* being homebound and *actually* needing skilled services. 42 C.F.R. § 409.41(c) (conditioning payment on all requirements contained in §§409.42-409.47 being met). Another condition for payment is that the services "must be furnished to an eligible beneficiary. . . ." 42 C.F.C. §409.41(a). Additionally, Congress has statutorily prohibited the payment of any Medicare claim for services that are not medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a

27

malformed body member").

Ms. White has alleged Gentiva falsified patient charts to make it appear as if Medicare patients were eligible for psychiatric home-health services and subsequently submitted claims to Medicare for payment despite Gentiva's knowledge that they were ineligible—in violation of 42 C.F.R.409.41(a). This alone is sufficient to defeat Gentiva's conditions for participation argument.

## 5. Holding Company Defense

Gentiva contends it "is a holding company that does not provide home health services directly to patients and does not directly bill for such services." Instead, the home-health services are provided through subsidiary home-health agencies. Gentiva claims Ms. White has not "[pled] any connection between Gentiva – in its role as a corporate parent – and any specific claim that was allegedly fraudulently billed to Medicare."

This argument forgets the basic axiom that, in a motion to dismiss, the plaintiff's allegations are accepted as true. Ms. White has made direct allegations against Gentiva. She alleged a number of individuals holding different job titles within the Gentiva organization executed several fraudulent schemes. Whether these employees perpetrating a fraud against the government were employees of Gentiva or employees of one of Gentiva's subsidiaries is a question of fact inappropriate for a motion to dismiss under Rule 12(b)(6).

## 6. Retaliation and Wrongful Discharge

### A. Retaliation under the False Claims Act

Gentiva asserts that Ms. White's retaliation claim under 31 U.S.C. § 3730(h) fails because she cannot establish that she would not have been terminated but for her alleged whistleblowing activity. To establish a retaliation claim under §3730(h), Ms. White must

28

demonstrate she engaged in a protected activity; her employer knew she engaged in the protected activity; and Gentiva "discharged or otherwise discriminated against [her] as a result of the protected activity." *Yuhasz v. Brush Wellman*, 341 F.3d at 566. Gentiva contends that, although some courts have held the plaintiff merely has to show the plaintiff's engagement in protected activity was a *motivating factor* for the adverse employment action, *Weigel v. Baptist Hospital of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002), the United States Supreme Court's recent decision in *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013), calls for a more stringent "but-for" requirement when pleading a retaliation claim.

Even if Gentiva's argument is correct, Ms. White has pled a viable claim. Gentiva mischaracterizes Ms. White's complaint when it argues "Ms. White affirmatively pleads that she was not meeting performance expectations and that she failed to correct those deficiencies despite repeated warnings that her job performance was inadequate." What Ms. White actually alleged was although she received frequent praise during the first nine months of her employment at Gentiva, after she pushed for an internal audit that revealed the extent of Gentiva's false certifications and recertifications, her supervisors demoted her, gave her unrealistic assignments, criticized her without justification, and finally terminated her. Taking these allegations as true, for the purposes of this motion to dismiss, Ms. White has sufficiently alleged that her push for an audit was the reason for her termination—that the criticism and allegations of poor performance were nothing more than a pretext for Gentiva's retaliatory actions. Accordingly, Gentiva's motion to dismiss will be denied with respect to Ms. White's §3730(h) claim.

### B. Tennessee Public Protection Act

Gentiva argues Ms. White's claim under the Tennessee Public Protection Act fails because she does not allege she was terminated *solely* for refusing to stay silent about illegal activities. Tenn Code Ann. § 50-1-304. As discussed above, Ms. White has sufficiently alleged her termination was the sole reason for her discharge and that any allegations of poor performance or failure to satisfy job requirements were merely pretext for retaliation. Accordingly, Gentiva's motion to dismiss will be denied with respect to Ms. White's state-law-retaliation claim.

### C. Common-Law Wrongful Discharge

Finally, Gentiva argues that Ms. White's claim for wrongful discharge under Tennessee common law (Count IV of the complaint) is preempted by the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). A federal law may implicitly preempt a state law cause of action where it regulates conduct in a field intended by Congress to be exclusively occupied by the federal government. *English v. General Elec. Co.*, 496 U.S. 72, 78 (1990). This intent may be inferred where the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.*

Gentiva contends the common-law retaliatory discharge claim, which seeks punitive damages unavailable under the False Claims Act, would circumvent the False Claims Act's remedial scheme and frustrate its purpose. A number of courts have rejected the argument that state-wrongful-discharge claims are preempted by the False Claims Act. *See, e.g., Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 945 (7th Cir. 2002) ("There is nothing in § 3730(h) to lead us to believe that Congress intended to preempt all state law retaliatory discharge claims based on allegations of fraud on the government."); *Boone v. MountainMade*

*Foundation*, 857 F.Supp.2d 111, 113 n.2 (D.D.C. 2012); *Glynn v. EDO Corp.*, 536 F.Supp.2d 595, 608–09 (D.Md. 2008); *Hoefer v. Fluor Daniel, Inc.*, 92 F.Supp.2d 1055, 1059 (C.D.Cal. 2000); *Palladino ex rel. United States v. VNA of S.N.J., Inc.*, 68 F.Supp.2d 455, 465–74 (D.N.J. 1999).

Allowing a plaintiff punitive damages for the common-law retaliatory discharge claim does not circumvent the False Claims Act's remedial scheme or frustrate its purpose; if anything, it buttresses it. Having a state-law remedy for retaliatory discharge "will further the federal interest of encouraging citizens to report fraud." *Palladino*, 68 F.Supp.2d at 467. Because the False Claims Act includes provisions to protect employees from retaliation who report fraud, allowing the second avenue of recovery under state law only provides additional protection and reassurance that a whistleblower will not suffer from retaliation. Accordingly, Gentiva's motion to dismiss Count IV of the complaint on the grounds it is preempted by the False Claims Act will be denied.

### IV.  Conclusion

For the foregoing reasons, Gentiva's motion [Docket No. 33] is **Granted in Part and Denied in Part**. The motion is **denied** with respect to Ms. White's allegations that Gentiva fraudulently certified and recertified psychiatric patients who were ineligible for home-health services; it is **denied** with respect to her retaliation claim under 31 U.S.C. §3730(h); and it is **denied** with respect to Ms. White's common-law retaliatory termination claim. Gentiva's motion is otherwise **granted**.

**It is so ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**